Filed 10/13/15  J.H. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| J.H.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SANTA CRUZ COUNTY,<br><br>    Respondent;<br><br>SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT,<br><br>    Real Party in Interest. | H042562<br>(Santa Cruz County<br>Super. Ct. No. DP002866) |

## I.    INTRODUCTION

J.H., the mother of the child at issue in this juvenile dependency matter, has filed a petition for extraordinary writ challenging the juvenile court's orders sustaining a Welfare and Institutions Code section 387 petition,[1] denying reunification services, and setting the matter for a section 366.26 permanency planning hearing.

_____

[1] All further statutory references are to the Welfare and Institutions Code.

On appeal, the mother contends the juvenile court erred by (1) denying reunification services, (2) declaring a mistrial during the hearing on the section 387 petition, (3) failing to ensure the mother had been offered reasonable services, (4) finding that return of the child to the mother's care would be detrimental to the child, (5) finding that it would not be in the child's best interest to reunify with the mother, and (6) placing the child in an out-of-county placement separate from the child's sibling. For the reasons stated below, we will deny the mother's writ petition.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Section 300 Petition*

On December 30, 2013, the Santa Clara County Department of Family and Children's Services (DFCS) filed a second amended petition under section 300, subdivision (b) [failure to protect] alleging that the 16-month-old child came within the jurisdiction of the juvenile court. The petition alleged that the father, S.W., was incarcerated.

On December 4, 2013, the police had taken the child into protective custody. The mother had been arrested for being under the influence of a controlled substance, felony possession of a controlled substance, and child endangerment. In the mother's hotel room, police found methamphetamine, glass pipes, and Vicodin pills, "all easily accessible" to the child. The mother had previously participated in drug rehabilitation programs, and she was on both probation and parole for drug-related offenses. The mother had admitted relapsing and using methamphetamine.

### B.     *Jurisdiction Report*

In a jurisdiction report dated December 30, 2013, the DFCS recommended that the juvenile court sustain the first amended section 300 petition.

2

The child was living with the maternal grandmother in Aptos. The mother had an older child (the child's half-sibling) as to whom the maternal grandmother was seeking a legal guardianship.

The family had 13 prior referrals. The mother had numerous prior felony and misdemeanor convictions, including a 2012 conviction for possession of a controlled substance, a 2011 conviction for possession of a controlled substance, a 2010 conviction for possession of a controlled substance, a 2004 conviction for being under the influence of a controlled substance, a 2003 conviction of driving under the influence causing death or bodily injury, a 2003 conviction for possession of a controlled substance, a 2002 conviction of driving under the influence, and a 1999 conviction for driving under the influence. The mother was on probation and on parole. The father had prior felony and misdemeanor convictions for resisting arrest, battery, and possession of a controlled substance, and he was incarcerated with a scheduled release date of November 23, 2014.

The mother reported that her relapses were usually due to her dating men with substance abuse issues. The mother wanted the maternal grandmother to become the legal guardian of her children. The mother indicated she wanted to "focus on her recovery" and "make sure that her children are in a safe and stable environment." The mother had taken steps to participate in residential treatment at New Life Community Services in Santa Cruz.

### C.    *Disposition Report and Addendum Reports*

The DFCS filed a disposition report dated January 22, 2014 as well as a number of addendum reports.

The mother was participating in residential treatment at New Life Community Services. She was also employed full-time as a paralegal. She wanted both of her children to be in legal guardianships with the maternal grandmother.

The DFCS recommended that the child be returned to the mother on family maintenance services. The mother had been "testing clean" except for one "abnormal"

3

test on January 8, 2014.  The social worker recommended that the case be transferred to Santa Cruz County.

On February 5, 2014, the Santa Clara County juvenile court ordered the child released to the mother on the condition the mother continued to reside at New Life Community Services and comply with the program's conditions.

### D.      *Jurisdiction/Disposition Hearing and Transfer-In Hearing*

On March 5, 2014, the mother and the father both submitted on the jurisdiction and disposition reports.  The Santa Clara County juvenile court sustained the petition and adopted the DFCS's recommendations, ordering the child returned to the mother on family maintenance services and ordering the case transferred to Santa Cruz County. The mother was ordered to participate in and successfully complete a parenting class, a counseling program, on-demand drug testing, a 12-step or other substance abuse program, and her residential drug treatment program.

The Santa Cruz County Human Services Department (HSD) filed a memorandum on April 24, 2014, regarding the transfer.  The mother had completed a three-month residential treatment program at New Life Community Services and had been approved to stay there another two months.  The child was not permitted to stay overnight with the mother, however, so the child slept at the maternal grandmother's home each night.  The mother was looking for a housing situation where she could live with her children.

The mother was participating in support groups, 12-step meetings, relapse prevention work, and counseling.  She continued to be employed full time.  She consistently tested negative on drug tests.  She was compliant with the conditions of her parole.

At a hearing on April 24, 2014, the Santa Cruz County juvenile court accepted the transfer-in.

### E. Six Month Review Hearing – October 2014

The HSD filed a report dated October 16, 2014, recommending the mother continue to receive family maintenance services.

The mother had been arrested on May 24, 2014 for possession of a controlled substance after she was found in possession of methamphetamine at New Life Community Services. She pleaded no contest and was placed on probation.

The mother was arrested again on July 17, 2014 for possession of a controlled substance after she was found in possession of methamphetamine in her vehicle. That charge was subsequently dismissed. However, during a booking search, the mother was found with more methamphetamine and a methamphetamine pipe, and she later pleaded no contest to "felony contraband in jail."

The child was not with the mother during any of the arrests. However, at the time, the child was living with the mother at the Female Offenders Training and Employment Program (FOTEP) located on Treasure Island in the San Francisco Bay, as mandated by conditions of her parole.

At the six-month review hearing held on October 16, 2014, the juvenile court found that Indian Child Welfare Act did not apply, and it continued the family maintenance review hearing. On November 13, 2014, the juvenile court adopted the HSD's recommendations, ordering family maintenance services to continue.

On December 4, 2014, the juvenile court ordered the case plan to include visitation for the father, who apparently had been released from custody.

### F. 12-Month Review Hearing – April 2015

The HSD filed a status review report dated April 16, 2015 in which it recommended the child remain a dependent of the court and that the parents both continue to receive family maintenance services.

On February 5, 2015, the HSD had received a report of neglect and abuse of the child by the mother. According to the report, the mother had taken "pictures of herself

5

smoking meth[amphetamine] in between having multiple sex partners while her kids are present," and she had been using "fake pee" for her drug tests.

The child was living with the father in a transitional housing program. The mother had admitted relapsing, and she had entered residential treatment at Janus Main on March 3, 2015. She planned to reside in the Janus Perinatal program with the child after completing the initial 28-day treatment program.

The mother had previously been referred to substance abuse treatment at Sobriety Works. She had entered that program on November 25, 2014, but she was discharged from the program on December 16, 2014 "due to poor attendance." She had been re-referred to Sobriety Works in January but did not follow through with reentering the program.

The mother had participated in 28 drug tests but had 10 "no shows." The drug tests were administered at Doctors on Duty. Doctors on Duty staff had called the HSD to report that they could not verify that the drug tests were accurate due to the mother's insistence on using a particular method of providing a urine sample. An oral swab test administered at Sobriety Works on February 11, 2015 showed that the mother had methamphetamine in her system.

The father had entered a residential drug treatment program upon being released from custody, and he had participated in services while he was in the program. Since leaving residential treatment, the father had failed to drug test on three occasions, and on the three occasions when he did drug test, the results were positive for marijuana.

At the 12-month review hearing on April 16, 2015, the juvenile court adopted the HSD's recommendations, continuing family maintenance services.

### G.    *Supplemental Petition and Report*

The HSD filed a section 387 petition on May 8, 2015, alleging that the mother had been asked to leave the Janus Perinatal program due to concerns that she was "actively using substances." Program staff had noticed "recent behavioral changes" in the mother,

and when the mother was asked to provide a mouth swab, she "appeared to tamper with the test so that a result could not be achieved." The father was in jail facing murder charges.

In a memo dated May 11, 2015, the HSD reported that the child was living with the mother in the maternal grandmother's home; the mother had signed a safety plan agreeing to that living arrangement. However, the HSD believed that the child was not safe in the mother's care and requested that the juvenile court order removal.

The memo explained that when the mother had been asked to do an oral swab, she had "held the testing device in her mouth for a period of time without getting it saturated with her saliva." The mother claimed that her medication caused her to have dry mouth, but Janus program staff reported that the mother had been biting on the swab instead of letting it touch her cheek.

After not completing the oral swab, the mother had submitted a urine test, which was negative for all substances. The mother acknowledged that she had previously "been cheating on her testing" by using synthetic urine, but she "swore that she was no longer doing this and was clean." However, staff from the Janus program had found urine samples hidden in a toy that was in the mother's room. Janus program staff subsequently reported that they had also found methamphetamine in the child's toy. The mother claimed that the urine samples and methamphetamine had actually been found in the laundry room adjacent to her room and that the toy containing urine and methamphetamine did not belong to the child.

### H. *Contested Detention Hearing*

At a contested detention hearing held on May 12, 2015, the case social worker, Wendell Stamps, testified that he had concerns about the mother's sobriety. His concerns were based on at least three reports that the mother was using drugs as well as the call he had received from Doctors on Duty staff regarding the mother's drug tests. The mother had been putting her hands between her legs during the observed tests; this was a method

7

people often used when they were trying to skew test results by hiding bottled urine. Stamps was also concerned because of the positive results of the oral swab taken at Sobriety Works in February.

The mother testified at the detention hearing. The mother admitted that she had cheated on a urine test in February. With respect to the oral swab that was attempted at Janus in May, the mother claimed to have performed the test "exactly as they indicated." The mother claimed that she had rubbed the swab on her lips, check, and tongue, but that after 20 minutes the swab "was not reading anything." The mother was taking three prescription medications, and dry mouth was a side effect of each one. The mother also denied that the toy found in the laundry room belonged to her or to the child.

At the end of the contested detention hearing, the juvenile court ordered the child detained, and it ordered supervised visitation for the mother at least three times per week. The juvenile court ordered no visitation for the father, who was once again incarcerated.

## I.      *Section 387 Report*

The HSD filed a report prior to the hearing on the section 387 petition, recommending that reunification services be denied as to the mother pursuant to the bypass provision in section 361.5, subdivision (b)(13).[2] The HSD noted that it might recommend that reunification services be denied as to the father pursuant to the bypass

---

[2] Pursuant to section 361.5, subdivision (b)(13), reunification services need not be provided to a parent if the court finds, by clear and convincing evidence, "[t]hat the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible."

provisions in section 361.5, subdivisions (b)(12) and (e)(1), depending on the outcome of his pending criminal case, which involved murder and attempted murder charges.[3]

The HSD's report described how the mother's alcohol and drug use began when she was a teenager, and how she experimented with other drugs while she was in high school. The mother had three DUI's before she was 21 years old, and she first used methamphetamine on her 21st birthday. "Once she started [using] methamphetamine, she could not stop." Her first treatment program was in 2003. The mother had been court-ordered to complete substance abuse treatment programs in 2009, 2011, and 2014. The mother had been discharged from the program at Sobriety Works in December of 2014 due to poor attendance. The mother had been re-referred to Sobriety Works in 2015 but had "never followed through with re-entering the program." She had entered the Janus Main 28-day residential program in March of 2015 and then transitioned to Janus Perinatal, but was discharged from that program in May of 2015. The mother had not shown up for two drug tests in May of 2015.

### J. First Contested Hearing and Mistrial

A contested hearing on the section 387 petition was set for June 29, 2015 and July 1, 2015. Prior to that hearing, the mother filed objections to hearsay evidence in the HSD's section 387 report.

On June 29, 2015, a contested hearing began in front of Judge Gallagher, who had presided over all of the proceedings since the transfer-in from Santa Clara County. The father, who remained incarcerated, had waived his presence.

---

[3] Pursuant to section 361.5, subdivision (b)(12), reunification services need not be provided to a parent if the court finds, by clear and convincing evidence, "[t]hat the parent or guardian of the child has been convicted of a violent felony, as defined in subdivision (c) of Section 667.5 of the Penal Code." Pursuant to section 361.5, subdivision (e)(1), reunification services need not be provided to an incarcerated parent if the court determines, by clear and convincing evidence, that services would be detrimental to the child.

Blanca Carrillo, the program coordinator at Janus Perinatal, testified about the mother's discharge from that program. After Carrillo's testimony was partially completed, the juvenile court ordered the hearing to continue on July 1, 2015.

On July 1, 2015, the HSD filed a memo to the court regarding updated information. A social worker had obtained information from the nurse practitioner who had been providing the mother with medication. The nurse practitioner confirmed that dry mouth was a side effect of the medication and that the mother's dose had been increased in April, but the nurse practitioner could not say whether the medication could have interfered with the mother's ability to provide an oral swab.

The mother had been inconsistently participating in counseling. She had attended four sessions between January and March of 2015 with one no-show in February. She had canceled two sessions in June of 2015 and no-showed for a third. The mother had attended 18 parenting classes.

The mother's recent visits with the child were documented in visitation logs attached to the HSD's memo. On May 18, 2015, when the mother arrived for a visit, the child had jumped into the mother's arms. The mother had provided healthy snacks, hugged the child, sung and read to the child. At the end of the visit, the child had gone with her foster parent "without fuss." The mother had been late to some visits, but she was sometimes waiting when the child arrived. The child cried at the end of a visit on June 1, 2015, but she usually separated from the mother without anxiety. At the end of a visit on June 5, 2015, the child ran to the paternal aunt, with whom the child had recently been placed. The child's sibling was present during a visit on June 8, 2015. The child had played with her sibling, hugged him, and wanted him to sit next to her. At the end of that visit, the child went to the paternal aunt "without fuss."

At the continued hearing on July 1, 2015, the HSD reported that the father wished to be present and to testify. The HSD suggested the hearing go forward that day, after which the hearing could again be continued for the father's testimony. Judge Gallagher

10

noted that if the hearing was again continued, he would not be available as a trial judge because he was moving to a different assignment. The mother objected to a further continuance, arguing that the father had notice of the hearing but "voluntarily waived his appearance." Judge Gallagher denied the request to continue the hearing, finding it in the child's interest that the matter proceed. However, after the parties discussed the witnesses and evidence that they would be presenting, Judge Gallagher found that the matter would not be able to conclude that day and declared a mistrial. The HSD objected to the mistrial, noting that the parties could come to the judge's new courtroom to finish the hearing. Judge Gallagher overruled the objection, finding that because he would no longer be a juvenile court judge, he could not hear the matter after he was in a new assignment.

A new contested hearing was set for July 8, 2015.

### K.    *Second Contested Hearing*

Prior to the next hearing, the maternal grandmother filed a "Relative Information" form, reporting that the child had "visibly lost weight" since her removal from the mother's custody and that "[o]nce cheerful and extroverted, she now presents as sad and doesn't speak. She now avoids eye contact." The maternal grandmother indicated she wanted the child placed with her.

The HSD filed a second memo to the court regarding updated information. The mother had admitted using methamphetamine while in treatment at Janus Perinatal and admitted that she had not been truthful about her "clean date." The father had submitted a letter stating that he had given the child a toy similar to the one in which the methamphetamine and urine were found. The father alleged that the mother had "used all the way through treatment." He alleged that when he and the mother lived together, the mother would use drugs while the child was in their apartment.

At the July 8, 2015 contested hearing, held in front of Judge Connolly, the father was not present, but he was represented by counsel who indicated that the father was

11

waiving his appearance. The father's counsel also indicated that the father supported the HSD's requests for removal and for denial of reunification services.

Carillo, the Janus Perinatal program coordinator, testified again, and she was found to be an expert in the area of evaluating the progress of clients who are undergoing drug and alcohol treatment. Carillo testified that the mother had been discharged from the program after the incident involving the oral swab on May 5, 2015. Carillo provided further details about that incident. The mother had been asked to do an oral swab due to concerns that she was "bottling"—that is, having bottles of urine inserted into her body so she could fake drug tests. Carillo had explained to the mother that the swab had to be rubbed on her cheeks and gums and held in the mouth until it was soaked. If the swab was saturated, a red line would appear. The mother had not followed the instructions. She had kept the swab in her mouth, between her lips, without rubbing it on her cheeks or gums and without allowing saliva to reach it. After five minutes, there had been no red line. The mother had complained of a dry mouth, but she had also refused water when it was offered to her.

Carillo also provided further details about finding the toy containing urine and methamphetamine. After the oral swab incident, she had gone into the laundry room at the program, which was located next to the mother's residential unit. She had looked inside a bag and found a stuffed toy. She had felt something in the toy, which had a zipper. Inside the toy, she had found a bottle of urine and a plastic Easter egg containing methamphetamine. She believed the toy belonged to the mother. There were no other children living on site at the time, there was no on-site childcare, and there were no stuffed animals kept on site. Also, different staff members had reported that they believed the mother was using methamphetamine, because they had observed her not sleeping.

Carillo acknowledged that the mother had been in the program for about two months before her termination, that she had participated in program activities, and that

she had been due to graduate on May 6, 2015, the day after the oral swab incident and the discovery of the toy. Carillo also acknowledged that the mother had a "really great relationship" with the child.

Stamps, the social worker, also testified at the hearing. The mother had "the most deep issue with substance abuse" he had ever seen. He did not believe the mother had "a handle on her addiction." It was not clear to Stamps that the mother's drug use had occurred when the child was not in her care. The mother had admitted using drugs around April 24, 2015 as well as in February of 2015—during periods of time where she had been in drug treatment and testing clean.

Stamps had observed that the mother and the child had "[a] very loving, deep relationship" and a "strong connection." He also acknowledged that the child was in good physical health and that she was on target developmentally. Nevertheless, he still believed that reunification services were not in the child's best interest, citing the "[u]nstable environment" provided by the mother as well as the risk to the child that would be presented by the mother's "decisions-making while she's under the influence." Stamps noted that the child's life had included "a bounce from relapse, to relapse, to relapse, to relapse for mom." At age three, the child had "probably more program time than a lot of adults." During the time he had been involved in the case, he had not seen "much forward progress" from the mother.

The mother testified that her "clean date" was June 29, 2015, meaning that she had last used methamphetamine on June 29, 2015. She had tested positive on July 2, 2015 as a result. She was residing at the Sobriety Works Sober Living Environment. She was attending Family Preservation Court on a weekly basis. She was attending therapy, parenting classes, Celebrating Families, and obtaining parenting guidance at Leaps and Bounds.

The mother continued to deny ownership of the items found in the toy at Janus Perinatal. She admitted she had relapsed and tampered with urine tests in February of

13

2015. She repeated her claim that her medications had caused her inability to complete the oral swab test at Janus.

The mother believed she had PTSD, ADHD, and an anxiety disorder. She was trying to obtain services for those issues. The medications she took were for anxiety and for her thyroid.

The mother described her history of drug treatment. In 2006, she had relapsed after having three years clean and sober. She had completed a six-month residential treatment program and had remained clean for a year and a half. In 2008 or 2009, she had relapsed again and had gone to Janus Perinatal. She had completed that program but "then had a slip" in 2010, at which point she had gone to New Life Community Services, pursuant to a court order. She had been discharged from New Life Community Services because of her inability to pay for the program. After that, she was incarcerated for a period of time but stayed clean "for awhile" after getting out. She became pregnant with the child and engaged in "a lot of services." She participated in the FOTEP inpatient program, pursuant to her parole terms, and completed it in February of 2013. She then moved in with her mother and became involved in a bad relationship, during which she relapsed again in December of 2013, when this case began. The mother had entered the New Life Community Services program at that time, but did not complete it because she had been found in possession of drugs while she was there, in May of 2014. In July of 2014, she had gone back to the FOTEP program for two or three months because of her arrest for drug possession, which was a parole violation. From October of 2014 until early January of 2015, she had attended a program at Sobriety Works, but her migraines made it difficult for her to attend and thus she had been asked to leave the program. The next program she entered was Janus Main, in February of 2015. She was "totally motivated" and made "a lot of progress" while in that program, and then asked to be transferred to Janus Perinatal, where the child could stay with her. She knew that she would not stay clean if she had gone home at the time. She and the child both "loved it"

14

at Janus Perinatal. In April of 2015, she discovered that the father had been accused of committing a homicide. That information posed "a big road block" in her recovery, and when she found drugs belonging to another patient, she used them.

The mother felt that she was "fully committed to [her] recovery." She was no longer denying that she had a problem. She believed that reunification was in the child's best interest because she had been the child's primary caregiver and because they had a very strong attachment.

The mother admitted that on July 1, 2015, she had gone to Family Preservation Court and indicated that her clean date was April 25, 2015, despite her use of drugs on June 29, 2015.

The child's attorney told the juvenile court that she had observed a recent visit between the mother and the child. The visit had been "very sweet." The mother had been "appropriate" with the child: she had brought healthy snacks, read to the child, and played with the child. The child had been very affectionate with the mother.

### L. *Juvenile Court Findings*

The juvenile court sustained the section 387 petition, finding that the previous disposition had been ineffective and that the child's removal from the mother's care was warranted. The juvenile court specified that it found, based on the evidence presented, that the mother had been using drugs while the child was present. The court also found that reasonable efforts had been made to prevent the need for removal.

The juvenile court next made the findings to support denial of reunification services under section 361.5, subdivision (b)(13). The court found that the mother had a history of extensive and chronic drug use, that she had resisted prior court-ordered treatment within the past three years, and that she had failed and refused to comply with the drug treatment aspects of her case plan.

The juvenile court then found the mother had not met her burden to show that reunification services would be in the child's best interest. The court found that the

15

mother had not been "fully truthful and credible" when she testified. The court also found, based on its review of the visitation reports and the child's lack of separation anxiety, that denial of reunification services would not be "devastating" to the child. The court found that the child needed stability, which she had not had in her life. The juvenile court also denied reunification services as to the father pursuant to section 361.5, subdivision (e).

The court continued the hearing to July 13, 2015 with respect to placement, and it set a permanency planning hearing for October 22, 2015.

### M. Placement Hearing

A contested hearing on placement took place on July 13, 2015.

Prior to the placement hearing, the maternal grandmother filed a de facto parent application. The maternal grandmother was the legal guardian for the child's half-sibling (the mother's older child). The maternal grandmother asserted that she spent time with the child on a daily basis, she attended court hearings concerning the child, and she took care of many of the child's basic needs. The maternal grandmother also asserted that the child had a "close bond" with her sibling.

The HSD filed a memo to the court prior to the placement hearing. The maternal grandmother had allowed the mother to have unsupervised contact with the child's half-sibling, including an overnight, which made the HSD concerned about the maternal grandmother's ability to set boundaries with the mother if she were to have the child placed with her. The maternal grandmother was also the guardian for another child (the son of the maternal aunt), and she had allowed the maternal aunt unsupervised access to that child. A report of general neglect of that child by the maternal grandmother had been substantiated.

At the time of the placement hearing, the child was residing with the paternal aunt and uncle, who were interested in providing a permanent placement for the child. The

16

child's attorney indicated that she was concerned about the separation of the child from her half-sibling but that she was interested in hearing the evidence.

Stamps, the social worker, testified that he believed the paternal aunt and uncle would be a safer placement than the maternal grandmother. He felt that the maternal grandmother had exhibited "[p]oor boundaries" and that her residence was "not a controlled environment." The maternal grandmother's residence was connected to the residence of the maternal aunt, who had an open case with the HSD due to substance abuse issues. He was concerned about the maternal aunt and the mother having access to the maternal grandmother's residence. He felt there was a possibility that the maternal grandmother would not follow the court's orders for visitation. Stamps was also concerned that the maternal grandmother would not have the skills to ensure the child's safety. The maternal grandmother had admitted not being aware of whether the mother and the maternal aunt were sober or using; she had indicated that she "stays out of their business."

Stamps had considered the sibling relationship as well as the relationships between the child and the maternal grandmother. He had also considered that the child had developed a relationship with the paternal aunt and uncle when she was in the father's custody.

The paternal aunt testified that she had had a relationship with the child throughout the child's life. During the child's second year of life, the child had spent some overnights with the paternal aunt. The paternal aunt had been taking the child for visitation with the mother, and she understood the importance of the child maintaining her family relationships.

The mother testified that she wanted the child placed with her son in the home of the maternal grandmother. She described the sibling relationship as "very, very close," explaining that they were "absolutely bonded to each other." She described the maternal grandmother's residence as "a second home" to the child. The mother believed that the

17

maternal grandmother had demonstrated she could set boundaries. The mother asserted that she would comply with a court order for supervised visitation and that she would not go to the maternal grandmother's house if the court imposed such an order.

The maternal grandmother testified that she had been a counselor in a group home and a Head Start teacher. She had a degree in child development and a certificate of proficiency in early childhood education. The maternal grandmother acknowledged allowing the mother to have an unsupervised visit with her son, explaining that the mother "seemed to be clean and sober at the time." The grandmother also acknowledged that she did "have problems" in the past with the other child, who she had adopted, but she asserted that now she would do whatever the HSD told her to do.

The HSD urged the juvenile court to maintain the child's placement with the paternal aunt and uncle. The child's attorney indicated she had a "heightened concern" about the maternal grandmother's ability to set boundaries but also a concern about how the child's sibling relationship would be affected by placement with the paternal aunt and uncle. The mother's counsel reiterated that the mother wanted the child placed with the maternal grandmother. The father's counsel reiterated that the father wanted the child placed with the paternal aunt.

The juvenile court found that there were "some positive things" about placement with the maternal grandmother, including the fact that the child would be with her sibling, but that there was "equal benefit" to placement with the paternal aunt. The juvenile court found that the sibling relationship weighed in favor of placement with the maternal grandmother but that the dependency history of the relatives living adjacent to the maternal grandmother weighed in favor of placement with the paternal aunt. The juvenile court found that the opportunity for permanency with the paternal aunt weighed in favor of placement with the paternal aunt. The juvenile court's "biggest concern" about placement with the maternal grandmother was her ability to provide a safe and stable environment. Referring to the recent incident involving the mother's unsupervised

18

visit with her other child, the juvenile court found that this factor weighed in favor of placement with the paternal aunt.

At the end of the hearing, the juvenile court ordered the child placed with the parental aunt. The juvenile court denied the maternal grandmother's request for de facto parent status but ordered her to have visitation, during which the sibling could also visit the child.

### N. *Writ Proceedings*

The mother filed a notice of intent to file a writ petition on July 14, 2015. On September 16, 2015, the mother filed a petition for extraordinary writ.

### III. DISCUSSION

### A. *Denial of Reunification Services*

The mother contends the juvenile court erred by denying reunification services at the hearing on the section 387 petition. The mother asserts that the juvenile court's ruling was not "supported by the facts" and that the ruling resulted from "misapplication of the law."

The basis for the juvenile court's order was the bypass provision contained in section 361.5, subdivision (b)(13), which provides that reunification services need not be provided if the court finds, by clear and convincing evidence, "[t]hat the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment

described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible."[4]

We review the juvenile court's findings under section 361.5, subdivision (b)(13) "under the substantial evidence test, which requires us to determine whether there is reasonable, credible evidence of solid value such that a reasonable trier of fact could make the findings challenged [citation]." (*In re Brian M.* (2000) 82 Cal.App.4th 1398, 1401 (*Brian M.*).)

Regarding the legal standard, the mother contends the juvenile court was required to find that her substance abuse created a substantial risk of detriment to the child or placed the child's health and safety at risk. In support of her assertion, the mother cites section 300, subdivision (b), which concerns jurisdictional findings, and *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, which concerned termination of reunification services under section 366.22, subdivision (a).

Having reviewed the record, we find that the juvenile court did not misapply the law when it denied reunification services to the mother. The juvenile court properly applied the factors set forth in section 361.5, subdivision (b)(13): that the mother had a history of extensive and chronic drug use, that she had resisted prior court-ordered treatment within the past three years, and that she had failed and refused to comply with the drug treatment aspects of her case plan.

Regarding the facts, the mother contends that she only had prior "slips," not "relapses" and that she engaged in treatment rather than resisting it. She acknowledges, however, that she was dropped from an outpatient program and missed some drug testing.

---

[4] The mother erroneously identifies section 361.5, subdivision (b)(6) as the basis for the juvenile court's denial of reunification services, but that subdivision applies in case of severe sexual or physical abuse and clearly was not applicable here.

The first requirement of section 361.5, subdivision (b)(13) is that "the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol." There are ample facts in the record supporting this finding. As documented in the HSD's section 387 report, the mother had been using methamphetamine since her 21st birthday, which was in 2002, and despite numerous attempts at substance abuse treatment programs and arrests, she had used methamphetamine several times during the dependency proceedings, including as recently as June 29, 2015.

The second requirement of section 361.5, subdivision (b)(13) is that the parent *either* "resisted prior court-ordered treatment . . . during a three-year period immediately prior to the filing of the petition" *or* "failed or refused to comply with a program of drug or alcohol treatment described in the case plan . . . on at least two prior occasions, even though the programs identified were available and accessible." Evidence in the record supports the juvenile court's finding that the mother failed to comply with a program of drug treatment on at least two prior occasions, even though the programs identified were available and accessible and were required by the mother's case plan. As the mother admitted in her testimony, she had failed to complete the New Life Community Services program in 2014 because she was found in possession of drugs while in the program, she was asked to leave the Sobriety Works program due to poor attendance, and she had failed to complete the Janus Perinatal program because she was found in possession of drugs and urine. The HSD's reports also document the mother's failure to complete these residential drug treatment programs.

We conclude that substantial evidence supports the juvenile court's findings under section 361.5, subdivision (b)(13). (See *Brian M., supra,* 82 Cal.App.4th at p. 1401.) Therefore, the juvenile court was required to deny reunification services unless it found, by clear and convincing evidence, that reunification was in the best interest of the child. (§ 361.5, subd. (c).)

21

The mother contends that the record shows that reunification *would* be in the child's best interest. The mother points to evidence of her engagement in her case plan as well as evidence of the child's strong connection to the mother. She specifically challenges the juvenile court's finding that denial of reunification services would not be "devastating" for the child.

"In determining [the child's] best interests, the 'court should consider "a parent's current efforts and fitness as well as the parent's history"; "[t]he gravity of the problem that led to the dependency"; the strength of the bonds between the child and the parent and between the child and the caretaker; and "the child's need for stability and continuity." ' [Citation] '[A]t least part of the best interest analysis must be a finding that further reunification services have a likelihood of success. In other words, there must be some "reasonable basis to conclude" that reunification is possible before services are offered to a parent who need not be provided them.' [Citation.]" (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164 (*G.L.*).)

" 'A juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion.' [Citation.]" (*G.L., supra,* 222 Cal.App.4th at pp. 1164-1165.)

Reunification was found not to be in the children's best interests in *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67 (*Randi R.*), which similarly involved a mother who had a long history of drug use, rehabilitation attempts, and relapses. In that case, two of the children had remained in the mother's care for more than two years following a prior dependency (*id.* at p. 69), and the mother had entered "yet another drug abuse rehabilitation program" after the children were removed from her care (*id.* at p. 73). The appellate court upheld the lower court's decision to deny reunification services and its finding that the mother had not shown that reunification would be in the children's best

interests, noting that the mother had had "many opportunities to gain control of her life" and that the children's future "should not be sacrificed to give her another chance to try to get and stay sober." (*Ibid.*)

Here, the juvenile court could reasonably determine that the mother's " ' "current efforts and fitness as well as [her] history" ' " showed that she still had a serious problem with substance abuse addiction that posed a danger to the child's safety. (*G.L., supra,* 222 Cal.App.4th at p. 1164.) The mother had relapsed on June 29, 2015, just a short time before the second hearing on the section 387 petition. This relapse followed two other relapses in February and April. Since the mother's prior attempts at substance abuse treatment had not been successful, the juvenile court could find that the child's future "should not be sacrificed to give [the mother] another chance to try to get and stay sober." (*Randi R., supra*, 64 Cal.App.4th at p. 73.) The juvenile court could also find that " ' "[t]he gravity of the problem that led to the dependency" ' " (*G.L., supra,* 222 Cal.App.4th at p. 1164) weighed in favor of finding that reunification was not in the child's best interest. The mother's difficulty with substance abuse was described by the social worker as "the most deep issue with substance abuse" he had ever seen.

The record further supports the juvenile court's finding that although there was a strong bond between the mother and the child, that factor was outweighed by " ' "the child's need for stability and continuity." ' " (*G.L., supra,* 222 Cal.App.4th at p. 1164.) The visitation logs show that while the mother and child were very close and loving with one another, the child did not experience separation anxiety at the end of visits and was doing well in the home of the paternal aunt, who she had also known for most of her life. We note that "bonds with the mother cannot be the sole basis for a best interest finding" and that the mother/child relationship may be a factor to be considered at the selection and implementation hearing, "if the court finds the children adoptable and considers terminating parental rights. (§ 366.26, subd. (c)(1)(B)(i).)" (*In re William B.* (2008) 163 Cal.App.4th 1220, 1229.)

23

Finally, the record here supports a finding that further reunification services would not have " 'a likelihood of success.' " (*G.L., supra,* 222 Cal.App.4th at p. 1164.) The mother has made numerous unsuccessful attempts at rehabilitation and had at least three relapses just during the six months leading up to the hearing on the section 387 petition. The juvenile court could therefore determine that there was no " ' "reasonable basis to conclude" that reunification [was] possible.' " (*G.L., supra,* at p. 1164.)

In sum, we conclude that the juvenile court did not err by denying reunification services to the mother at the hearing on the section 387 petition.

### B. Mistrial Ruling

The mother contends the juvenile court erred by declaring a mistrial at the initial hearing on the section 387 petition. She requests we issue a peremptory writ commanding the Santa Cruz Superior Court to require Judge Gallagher to complete the hearing "in a reasonable time, regardless of his present assignment." The mother contends that she was prejudiced by Judge Gallagher's mistrial ruling because it gave the HSD an opportunity to "start all over in front of a new judicial officer" and allowed the HSD to present Carrillo as an expert witness who could testify to and rely on hearsay statements.

The mother relies on *Blumenthal v. Superior Court* (2006) 137 Cal.App.4th 672 (*Blumenthal*), a family law case. In *Blumenthal*, a judge was assigned to the case in 2002, after the dissolution but before trial of the reserved issues. (*Id.* at pp. 674-675.) The matter was continued numerous times was finally heard beginning on October 31, 2005. (*Id.* at p. 675.) After hearing testimony on that date, the trial judge continued the hearing to November 18, 2005, and told the parties that they would have to finish by 3:00 p.m. on that date. (*Ibid.*) However, when that time came, the parties still had witnesses to present. The trial judge expressed frustration with the fact that the case had been going on so long and informed the parties that there was not another open hearing date until 2006, at which point the judge would be moving to the department next door to

24

hear a domestic violence calendar. (*Id.* at p. 677.) The trial judge then declared a mistrial. (*Ibid.*)

On writ review following the mistrial, the appellate court explained that an order granting a mistrial is reviewed for abuse of discretion, but that a mistrial should be granted only when necessary because "some *error* has occurred which is too serious to be corrected." (*Blumenthal, supra,* 137 Cal.App.4th at p. 678.) That is, a mistrial should be granted " '*only* when a party's chances of receiving a fair trial have been irreparably damaged.' " (*Id.* at p. 679.)

The *Blumenthal* court first rejected the notion that the mistrial could be declared based on the parties' failure to comply with the time deadline imposed by the trial judge. The parties had not exceeded "any time estimate that *they* had previously given," the trial had taken only two days, and when the time deadline was reached, they only had "a few hours left to go." (*Blumenthal, supra,* 137 Cal.App.4th at p. 684.)

Next, the *Blumenthal* court found that the mistrial was not justified by the trial judge's new assignment. The appellate court emphasized that the judge was "literally moving over one courtroom . . . in the same building" and found that there was no reason that the judge could not have found "a few extra hours" to "finish up" the case. (*Blumenthal, supra,* 137 Cal.App.4th at p. 685, fn. omitted.) The *Blumenthal* court acknowledged that it "would, of course, be impossible" for a judge to bring "all the cases" in his or her " 'inventory' " to a new assignment, but concluded that a trial judge should have the burden to demonstrate why he or she could not complete the "limited number" of trials that had already begun at the time of the new assignment. (*Id.* at p. 686.)

Finally, the *Blumenthal* court noted that in that case, where the parties were "people of limited means" but were represented by private counsel, a mistrial would "inflict the hardship of the additional attorney fees" incurred for two more days of trial. (*Blumenthal, supra,* 137 Cal.App.4th at p. 687.) The court concluded that the mistrial

25

ruling had been an abuse of discretion and issued a peremptory writ commanding the superior court to require the trial judge to complete the trial. (*Id.* at pp. 687-688.)

The instant case is distinguishable from *Blumenthal* in several ways. First, *Blumenthal* was a family law case, in which the trial judge moved to a different family law assignment, and the instant case is a juvenile case, in which the trial judge moved out of the juvenile court. "Judges of the juvenile court are specifically designated to conduct the business of the juvenile court. Superior court judges not so designated may not hear and rule on juvenile court matters." (*Cimarusti v. Superior Court* (2000) 79 Cal.App.4th 799, 805; see also *Andrews v. Superior Court of San Joaquin County* (1946) 29 Cal.2d 208, 211 ["the superior court sitting as a juvenile court has exclusive jurisdiction in juvenile court law matters"].) In addition, here the parties were not represented by private counsel, and starting over in front of a new judge did not impose the kind of financial hardship that concerned the court in *Blumenthal.*

Even assuming that Judge Gallagher would have been able to hear this matter after moving out of his juvenile court assignment assignment, this case is still distinguishable from *Blumenthal* because here the parties *did* receive a full hearing. The mother did not file her writ petition challenging the mistrial ruling until *after* the second hearing on the section 387 petition had been completed. In fact, the mother did not object to the mistrial until the day of the second hearing on the section 387 petition. Moreover, Judge Connolly noted that she had "reviewed the entire file" prior to the hearing on the section 387 petition, and her comments throughout the proceeding indicated that she was familiar with the history of the case. Under the circumstances, where the parties received a full and fair hearing on the section 387 petition, issuing a writ commanding the superior court to have Judge Gallagher conduct a further hearing would serve only to delay this matter and would not further the interests of justice. We therefore decline to issue the requested relief.

26

### C. *Reasonable Services*

The mother contends she did not receive reasonable services. She asserts that she is currently "thriving" in a long-term program in Santa Clara County, and she complains that she was not previously offered the opportunity to participate in such a program because there are no such programs in Santa Cruz County. The mother also asserts that the HSD should have made more efforts to help the mother with her mental health problems, which "interfered with her ability to engage in the Court-ordered case plan."

The mother relies on *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, which involved termination of reunification services at a 12-month review hearing. As the HSD points out, there is no requirement of a "reasonable services" finding in this case, which involves an order *denying* reunification services, and thus a challenge to the previously-ordered services (i.e., family maintenance services) is not cognizable in this writ proceeding.

"In a section 387 disposition hearing, the Agency has the burden of proof to show reasonable efforts were made to prevent or eliminate the need for removal. [Citations.]" (*In re Javier G.* (2006) 137 Cal.App.4th 453, 463.) Even assuming that the mother's challenge is to the juvenile court's "reasonable efforts" finding, that finding was supported by substantial evidence in the record. The mother's case plan included parenting classes, counseling, drug testing, and residential drug treatment. The mother was placed on family maintenance services with the child in her custody and thus was given an opportunity to show she could maintain sobriety while caring for the child. The mother was receiving mental health treatment and taking medication to address her mental health, and she admits she was given advice and information on how to obtain additional treatment. The mother's most recent residential drug treatment was terminated due to her own actions—her refusal to complete the oral swab test and her possession of urine and methamphetamine—and thus the mother has not shown that longer-term treatment would have prevented or eliminated the need for the child's removal.

27

#### D. *Detriment Finding*

The mother contends the juvenile court erred by finding that returning the child to her custody would be detrimental to the child. However, such a finding was not required in this matter, which involved a section 387 petition and denial of reunification services under section 361.5, subdivision (b)(13). A detriment finding is required at the 6-, 12-, and 18-month review hearings held during the reunification period. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308; §§ 361, subd. (b), 366.21, subds. (e) & (f), 366.22, subd. (a).)

#### E. *Placement*

The mother contends the juvenile court erred by placing the child out-of-county and separate from her sibling. The HSD contends that the placement issue is not cognizable because the order was made "at a later hearing." Neither party cites to any statutory or case authority.

The record indicates that the placement hearing held on July 13, 2015 was a continued part of the section 387 hearing. We will assume that review of the placement order is cognizable in the present writ proceeding.

Section 361.3 specifies the factors to be considered in determining whether to place a child with a relative. The factors include: the best interest of the child; the preference for placement of siblings in the same home; the moral character of the relative and any other adult living in the home, including whether any individual residing in the home has been responsible for acts of child abuse or neglect; the relationship between the child and the relative and the relative's desire to provide legal permanency for the child if reunification is unsuccessful; and the relative's ability to provide a stable environment for the child, to protect the child from the parents, and to facilitate visitation. (§ 361.3, subd. (a).)

Section 361.3, subdivision (b) specifies that when "more than one appropriate relative requests preferential consideration . . . , each relative shall be considered under the factors enumerated in subdivision (a)."

28

"A juvenile court's placement orders are reviewed under the abuse of discretion standard; the court is given wide discretion and its determination will not be disturbed absent a manifest showing of abuse. [Citation.] The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. [Citation.] A court has exceeded the bounds of reason by making an ' " 'arbitrary, capricious, or patently absurd determination. . . .' " ' [Citation.] 'Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' " ' [Citation.]" (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1420-1421 (*Sabrina H.*).)

Here, the juvenile court went through the statutorily enumerated factors when deciding whether to place the child with the maternal grandmother or the paternal aunt and uncle. The juvenile court considered the sibling relationship and found that the sibling relationship weighed in favor of placement with the maternal grandmother but that the dependency history of the relatives living adjacent to the maternal grandmother weighed in favor of placement with the paternal aunt. The juvenile court also found that the opportunity for permanency with the paternal aunt weighed in favor of placement with the paternal aunt. The court expressed a concern about the maternal grandmother's ability to provide a safe and stable environment for the child, particularly in light of her allowing the mother's recent unsupervised visit with her other child, and found that this factor weighed in favor of placement with the paternal aunt. The juvenile court's weighing of these factors, each of which was supported by evidence in the record, did not "exceed[] the bounds of reason." (*Sabrina H., supra,* 149 Cal.App.4th at p. 1421.) We find no abuse of discretion in the juvenile court's decision to place the child with the paternal aunt.

29

## IV. DISPOSITION

The petition for extraordinary writ is denied.

_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:



_____
ELIA, ACTING P.J.




_____
MIHARA, J.