Filed 1/10/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re G.L., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D064521 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ11298E) |
| v. | |
| D.L., | |
| Defendant and Respondent; | |
| G.L. | |
| Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner. Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Appellant.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

G.L. appeals following the contested disposition hearing in which the juvenile court found the provisions of Welfare and Institutions Code[1] section 361.5, subdivision (b)(1) had been established for the denial of services to his mother, D.L., in light of her history of extensive and chronic drug use and her failure to reunify with her other children, but nonetheless ordered reunification services for D.L. after it found, pursuant to subdivision (c) of section 361.5 and by clear and convincing evidence, that reunification was in the best interests of G.L. We affirm.[2]

## BACKGROUND

In March 2013, San Diego County Health and Human Services Agency (agency) filed a juvenile dependency petition (petition) on behalf of then one-year-old G.L., alleging the child had suffered, or there was a substantial risk the child would suffer, serious physical harm or illness as a result of D.L.'s alleged failure or inability to supervise or protect adequately the child. (§ 300, subd. (b).) Specifically, the petition alleged that from mid-January to early-March 2013, the "child's mother left [him] inadequately attended in that the mother dropped this one-year-old child off with a

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     In light of our decision and the fact there was no challenge to the court's order that father receive services, we conclude V.A.'s motion to dismiss the appeal as to him is moot.

2

relative without making provisions for the child's long term care and support and failed to return to retrieve the child. The mother has a long history of substance abuse and parental neglect and lost custody of four older siblings and failed to reunify with any of them. The mother admitted using heroin throughout one of her pregnancies and another sibling was born positive for opiates and suffered drug withdrawal symptoms and there is a substantial risk the child will suffer serious physical harm or illness."

In her March 8, 2013 detention report, social worker Marie Hommel stated the agency in late January 2013 received a referral to the child abuse hotline from G.L.'s maternal aunt, L.W. D.L. in mid-January 2013 asked L.W. to care for G.L. after S.A., the mother of V.A., who was ultimately found to be G.L.'s father, told D.L. she wanted D.L. out of her house. In late January 2013, L.W. became concerned about G.L. after the child developed a fever. L.W. had no legal status to care for G.L. long term, and D.L. had only contacted L.W. once since leaving G.L. with her.

The detention report noted D.L.'s long history of drug use, including heroin and methamphetamine, suggested D.L. was then homeless and further noted a warrant had been issued for D.L. for violating her conditions of probation. The detention report also noted D.L. had no parental rights over four of her other children and had failed to reunify with those children. The agency in the detention report did not recommend services for L.W.

According to L.W., her sister D.L. started having problems after D.L. was molested when she was eight years old. D.L. later joined a gang and began using and

3

selling drugs. L.W. had little or no contact with D.L. for "several years," until L.W. visited D.L. in a shelter and saw G.L., whom D.L. described as "really well behaved." According to L.W., during one of these visits with her sister, D.L. "seemed better" and G.L. "looked fine."

The court at the March 8, 2013 detention hearing ordered G.L. detained in the approved home of a relative. The court also ordered that the agency continue its efforts to locate G.L.'s parents; that services be provided "as soon as possible to effectuate reunification," including parenting classes and counseling; that D.L. be afforded supervised and liberal visitation with G.L.; and that D.L. meet with a substance abuse specialist for screening and referral.

Social worker Maribel Onstott in the March 28, 2013 jurisdiction/disposition report noted that D.L.'s whereabouts at that time were still unknown and that D.L. had five other children (not including G.L.), all of whom had been adopted by relatives. The jurisdiction/disposition report noted that D.L.'s oldest daughter was not a dependent of the court and has resided with a maternal aunt (not L.W.) since infancy and that D.L. failed in her reunification efforts and her parental rights were terminated to four of her children as a result of substance abuse and a lengthy criminal history. Based on D.L.'s extensive drug and criminal history and her failed past reunification efforts with her other children, the jurisdiction/disposition report recommended that D.L. not be offered reunification services.

The court in early April 2013 continued the jurisdiction hearing after D.L. appeared before the court. Before doing so, however, the court ordered V.A. to submit to genetic testing and ordered supervised visitation between D.L. and G.L. at Las Colinas Women's Detention Facility on the condition that D.L. qualifies for such visits and that G.L. expresses no fear or anxiety.

In the April 22, 2013 addendum report, social worker Onstott noted D.L. had been arrested at a grocery store in Vista, California after D.L. stole groceries because she was hungry. Because of an outstanding warrant, D.L. was arrested and was incarcerated at Las Colinas. In the April 22 report, Onstott noted G.L. was having supervised visits with his then-alleged father, V.A. With regard to visitation with D.L., Onstott noted that she took G.L. to Las Colinas on April 10, 2013 and supervised a visit between him and his mother; that G.L. at first was "hesitant" to go to his mother but, after about 15 minutes, G.L. allowed his mother to hold him; that D.L. spoke "warmly" to G.L. and played games with her son; and that, overall, the visit went well considering G.L. and not seen his mother since mid-January 2013.

Social worker Onstott in her May 13, 2013 addendum report noted that genetic testing confirmed that V.A. was in fact G.L.'s biological father. Onstott noted she had spoken by telephone to D.L. from Los Colinas and that D.L. was enrolled in "NA [i.e., Narcotics Anonymous] classes, a parenting class and job skills course." D.L. also told Onstott she was attending a Christian church service and was hoping to enter a residential treatment program on her release from jail so that she could care for G.L.

5

The May 13 report stated Onstott supervised a visit between D.L. and G.L. in early May 2013 at Las Colinas. According to Onstott, D.L. spoke "warmly" to her son and told him, "'I love you,'" "'you are so handsome, strong, and smart,'" and played with him during the entire visit. Although G.L. did not want to be held by his mother, he happily played with her; and D.L. did not push G.L. to "hug or kiss her" but instead gave G.L. his space. Onstott noted G.L.'s caregivers reported D.L. called her son "regularly" and always asked the caregivers how G.L. was doing.

In the June 5, 2013 addendum report, social worker Onstott reported V.A. was terminated from his residential treatment program after testing positive for methamphetamine. Onstott stated in this report that she supervised a visit between G.L. and D.L. in late May 2013; that the visit went "very well"; that D.L. reported she would be released to a residential program in mid-June 2013; that this was the first time G.L. immediately went to his mother on seeing her, and they played, spoke, hugged and kissed throughout the visit; that G.L. laughed out loud with his mother and D.L. followed her son's lead in play, including squatting down with him during play; that D.L. told Onstott she was "enjoying her parenting group and has been processing the guilt from having other children that she is not caring for," all of which made her cry; and that, at the end of the visit, D.L. told her son she loved him and she could not wait to see him again as they hugged and kissed.

In the June 24, 2013 addendum report, Onstott reported that D.L. had been released from custody on June 18 and transported to a residential treatment program

6

called Serenity House. The June 24 report summarized two telephone calls between D.L. and Onstott in which D.L. stated that she wanted services; that she did not want to "'give up'" on G.L. and would "'fight to get him'" because she was doing better; that in the past she was "'naïve'" and her family enabled her behaviors; that she was now more mature than in the past and wanted to "go into a program and prove that she will be able to be a mother for [G.L.], and to 'be a mother for once'"; and that D.L. was focusing on her sobriety, avoiding unhealthy relationships and seeking to make positive changes in her life, which D.L. believes she could do with "help and guidance."

The June 24 report noted V.A. had been arrested for possession of drug paraphernalia and on other charges. V.A. expressed regret for relapsing and stated his desire to be free from drugs and to be with his son G.L.

The court at the contested jurisdiction hearing in late June 2013 received into evidence the agency's reports, with the exception of the June 24, 2013 addendum (that was received in the disposition hearing in July 2013, as discussed *post*), and heard the testimony of social worker Onstott. At the conclusion of the hearing, the court found by clear and convincing evidence that G.L. was a person described under section 300, subdivision (b) in that the child had suffered, or there was a substantial risk that the child would suffer, serious physical harm or illness as a result of the failure of the child's parents to supervise or protect adequately the child.

The July 15, 2013 addendum report for the July 15 disposition hearing noted D.L. had been dismissed from Serenity House on June 28 after being admitted to the program

7

on June 18, 2013, because she was disrespectful to staff and other clients in the program. D.L. subsequently contacted Onstott on July 1, 2013, informing the social worker of her efforts to get into a new treatment program and discussing her living arrangements while waiting to do so.  Onstott told D.L. to get drug tested at US HealthWorks in National City, which D.L. did that same day.  D.L. tested negative for drugs.

The July 15 addendum report also shows D.L. called Onstott the following day to inform the social worker she was going to begin the residential treatment program Kiva[3] on July 8, 2013.  The next day, July 3, D.L. again called Onstott to inform her D.L. would not begin the Kiva program until July 9.  During one of these phone calls, D.L. told Onstott that she was "'clean and sober'" and was "'not giving up.'"

The July 15 report noted that Onstott supervised a visit between D.L. and G.L. at Serenity House before D.L. was dismissed from that program.  Also in attendance at the visit was L.W.  Although G.L. initially did not want to go to his mother when she extended her hands to him, after seeing the playroom, G.L. allowed his mother to hold him and followed her while they played.  According to Onstott, G.L. appeared comfortable with both D.L. and L.W., and D.L. often asked L.W. questions about G.L., including what activities he liked.

---

3     Kiva is a six- to nine-month residential drug and alcohol treatment program for substance-abusing women and their children and is part of the McAlister Institute For Treatment and Education, Inc. "While in the Kiva program, the women are provided referrals for psychiatric evaluation and individual counseling as needed.  All clients are tested for drugs and alcohol while at Kiva by random urinalysis."

The July 15 report also included, as an attachment, certificates of completion by D.L. of two, 16-hour instructional courses in substance abuse/parenting and in competencies for "Employment for Life" that D.L. participated in while incarcerated at Las Colinas, as well as a certificate for attending a "family connections" workshop. Also attached to the July 15 report was an inmate adjustment report showing D.L. asked for services and showed she participated in meetings of NA, parent education and job skills.

The July 15 report also included a June 3, 2013 letter from Donna Cleveland, in-custody program director of Welcome Home FAiR, describing D.L.'s efforts to reach out and receive help "as part of her recovery and reentry process." In Cleveland's letter, she noted D.L. "received an intensive therapeutic process, individualized holistic case management, pre-treatment planning, and long term recovery/reentry goal setting." Cleveland's letter also noted that, as of that date, D.L. had completed 100 hours of FAiR training, showing D.L.'s willingness to participate in her recovery by attending (i) self-awareness groups, where the goal is to "help women begin to identify who they are [and] not what they did"; (ii) relationship groups, where the goal is to "help women understand the differences between healthy and unhealthy relationships" and how such relationships can lead to a "life of addiction"; and (iii) relapse prevention training, which is designed to help "women begin to notice the triggers they have taken for granted in the past and acknowledge the need to use cognitive behavioral tools to overcome even the slightest trigger, to avoid potential relapse."

At the July 15 disposition hearing, the court considered the evidence already presented at the late-June 2013 contested jurisdictional hearing and the additional addendum reports, including the documentary evidence attached to the July 15 report as discussed.  The court also took judicial notice of the findings and orders made in G.L.'s siblings' cases.

D.L. testified at the contested disposition hearing that after she was dismissed from Serenity House in late June 2013, she applied to Kiva, the House of Metamorphosis and Casa de Milagros for treatment.  Ultimately, she was admitted into the Kiva program on July 9, as noted in the July 15 addendum report.  D.L. said she drug tested during the time she was not in a treatment program, as requested by the social worker, and stayed in close contact not only with the social worker but also with probation and her son G.L.

At the conclusion of D.L.'s testimony, the court inquired about the Welcome Home FAiR program.  D.L. stated she is still part of that program.  In addition, D.L. noted she had been involved in that program about 10 years earlier.  The court in response asked D.L. what was different at the present time versus 10 years ago.  D.L. responded:  "More experience, life experiences.  Just tired.  I just realized nobody else is going to come and rescue me, save me.  It's time for me just to step it up, make a change for now and myself and my children."

At the close of evidence and after hearing the arguments of counsel, which primarily focused on whether D.L. would be offered reunification services at the same time those services were offered to V.A., the court ruled in part as follows:

10

"I have read and considered the reports in evidence. I've reviewed the mother's documentation. I've listened carefully to mother's testimony. I would order, declare and adjudge [G.L.] to be a dependent of the court under the care, custody and control of the agency. Custody will be removed from the parents pursuant to section 361[, subdivision] (c), the court is making a [section] 361[, subdivision] (c)(1) finding by clear and convincing evidence.

"The court will order that [G.L.] be placed with relatives. . . . [¶] . . . [¶] The gravamen of this case turns on whether the court orders reunification services for mother, or orders that the agency not offer services to her. In support of the request, the agency is relying on [section] 361.5[, subdivisions] (b)(10), (11) and (13). I have, for the record, reviewed the orders and petitions in the following sibling matters . . . .

"Under subdivision (b[)](10), the court must find whether the court had ordered termination of reunification services for any siblings or half siblings, because in this case the mother failed to reunify with those half siblings or siblings who had been removed from mother's custody pursuant to [section] 361, and is the same parent. Here, in [B.P. and V.V.]'s matter, the court did order reunification services for the mother. The mother of those two half siblings is the same as [G.L.]'s mother, and the court did terminate reunification services in each of those cases based on the mother's failure to reunify. The court made those finding[s] by clear and convincing evidence.

"With respect to [subdivision] (b)(11), the court must find there have been parental rights terminated. And here as to all four of the siblings, parental rights for the mother

11

were terminated. They were terminated on July 6th of 1999 regarding [B.P.]; June 30, 2004 regarding [V.V.]; [and] May 8th of 2008 regarding [E.S. and D.S.] The court does find that the mother of those four siblings or half siblings is the same as [G.L.]'s mother, and makes those findings by clear and convincing evidence.

"With respect to [subdivision] (b)(13), the court would have to find that the mother has a history of extensive, abusive and chronic use of drugs and alcohol and has resisted prior treatment during a three-year period immediately filing the petition which brought the child to the court's attention or has failed to or refused to comply with the program of treatment required under [section] 358.1 on at least two prior occasions. . . .

"Regarding [subdivision] (b)(13), . . . [t]he testimony before the court is that mother was resisting treatment through her probation and the criminal proceedings. So I do find that provision has been proved by clear and convincing evidence.

"With regard to [subdivisions] (b)(10) and (b)(11), the court would also have to find that mother has not subsequently made reasonable efforts to treat the problems that led to the removal of her children. That's a very close and very difficult balancing for the court, because I do recognize that mother is her own worst enemy when it comes to interaction with people and authority and taking responsibility for her chemical dependency issues.

"Now, the positive things are that when mother visits with [G.L.], he reacts positively after a period of time, the mother inquir[es] about his welfare, seems concerned about his welfare, and mother has tested negatively over the last several weeks

12

even though there's a gap in her programs.  When the mother left—was asked to leave Serenity on June 26th [sic], she did, in my view, pursue diligently an alternative, and subsequently was accepted into Kiva on July . . . 9th.

"But on the other hand, the mother's reason for discharge from Serenity House is quite serious.  Mother indicates she didn't do anything wrong.  But according to the program, the mother got into a verbal discussion that escalated with a member of her group.  The facilitator intervened and tried to calm things down and could not.  The mother was taken to the director's office where things did not deescalate, but escalated, to which the mother referred to the director with a very derogatory term.  It got to the point where the mother became stubborn and wouldn't leave and they had to call the police.  That's a far cry from doing nothing.  [¶] . . . [¶]

"But I do have to conclude mother's recent efforts have been reasonable under the circumstances.  She's in the Fair Program, has been there for a substantial period of time.  She's done well.  She's going to stay with the Fair Program.  She's connected with the church that's seems to be very supportive of her to which she is also connected, and she's in the Kiva program, which is a very good program.

"But I have to let the mother know the margin for error is very minimal in this case.  When you feel those emotions welling up where you have to lash back, or you have a disagreement and you don't practice some techniques to disengage before it really escalates, then you're going to find yourself back here in the same situation, and you may

13

not fare as well. But there is some responsibility you alone have to take on. And you have to learn techniques for handling this frustration and the anger that you have.

"So I do not find [subdivision] (b)(10) and (11) have been proved. As to [subdivision] (b)(13), it has been proved, but under subdivision (c), the court has to find—does not order services unless finding by clear and convincing evidence it would be in the best interests of the child. Here I do find by clear and convincing evidence that it would be in the best interest of [G.L.] for the following reasons: One, I think this court has been hard on the mother about her conduct and action, but it has to be put into context.

"Mother has had a debilitating life experience with drugs and criminal activity. And I do think that's probably hardened by her huge humanity, and I don't think she trusts people. I know she doesn't trust people in authority. These are going to be all new experiences for mother if she chooses to find the strength to address them. If she continues with her present motivation, I have every confidence she can do that.

"Second, [G.L.] is two. While it's true that mother only had primary responsibility for him for five months, that's not an insignificant period, and mother's recent interaction with [him] indicates that it's positive and it can be built upon.

"And third, we're offering services to the father. The father has only met his son, I believe, one time in March. So he will be getting services to assist him in regaining custody, in which case the mother will be in a position of coparenting the child. So I think to assist the father and child with that reunification effort, it would be important to

14

also shore up the mother's issues to maximize reunification of [G.L.] with at least one of his parents.

"So I will order that the agency offer reunification services to the mother. I believe the case plan should be residential treatment. The mother would not be permitted to leave her residential treatment unless she is officially released by her case manager. The mother would have to enroll in . . . after care, and follow-up care is required after her residential treatment. Mother would have to attend parenting classes and counseling, and would have supervised visits with her son.

"I'll incorporate by reference the balance of the recommendations in the report, making all findings by clear and convincing evidence."

DISCUSSION

As stated, G.L. contends the court abused its discretion and thus erred when it determined reunification was in his best interest and ordered the agency to provide such services to D.L., his mother.

Subdivision (b) of section 361.5 contains 16 exceptions that permit a court to deny reunification services to a parent. These exceptions "have been referred to as reunification 'bypass' provisions." (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 845.) If any one of the exceptions applies, a court may deny reunification services to a parent. (*Id.* at p. 846; see also § 361.5, subd. (b).) The bypass provisions are based on the fact that "it may be fruitless to provide reunification services under certain circumstances." (*Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750.)

15

An appellate court reviews a court's findings under section 361.5 for substantial evidence. (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 843.) In so doing, we presume "in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

Here, the court relied on bypass provision (13), which denies reunification services if a court finds by clear and convincing evidence that "the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible." (§ 361.5, subd. (b)(13).)

However, as noted, the court also found under section 361.5, subdivision (c) that granting D.L. reunification services was in the best interest of G.L. Subdivision (c) of section 361.5 provides in part that the "court shall not order reunification for a parent . . . described in [any one of the bypass provisions] of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child."

In determining the children's best interest, the "court should consider 'a parent's current efforts and fitness as well as the parent's history'; '[t]he gravity of the problem that

16

led to the dependency'; the strength of the bonds between the child and the parent and between the child and the caretaker; and 'the child's need for stability and continuity.'" (*In re William B.* (2008) 163 Cal.App.4th 1220, 1228.)  "[A]t least part of the best interest analysis must be a finding that further reunification services have a likelihood of success. In other words, there must be some 'reasonable basis to conclude' that reunification is possible before services are offered to a parent who need not be provided them."  (*Id.* at pp. 1228–1229.)

"A juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.]  An appellate court will reverse that determination only if the juvenile court abuses its discretion." (*In re William B.*, *supra,* 163 Cal.App.4th at p. 1229.)

Here, we conclude the court did not abuse its discretion when it found it was in G.L.'s best interests to provide D.L. reunification services.  The record clearly shows the court considered in detail multiple factors in making this determination, including D.L.'s *current* efforts to get treatment for her long-history of drug dependency and the strength of the bond between D.L. and G.L.

Indeed, the record shows that once D.L. was arrested in late March 2013 and placed in Las Colinas, she sought services and participated in NA, parent education, and job services meetings.  D.L. also completed at least 100 hours of training in the FAiR program while incarcerated.  The director of this program described D.L.'s efforts to reach out and receive help for her chemical dependency.  In addition, D.L. also

17

completed two, 16-hour instructional courses in substance abuse/parenting and competencies for employment and participated in a "family connections" workshop, while incarcerated.

Moreover, the record shows that once D.L. was released from jail, she went to the Serenity House for residential treatment. When she was dismissed from that program, the record shows D.L. immediately sought to enter a new program and remained in constant contact with the social worker, probation and her son and his caregivers during the period she was in between programs. And, when she was told by the social worker to get drug tested, D.L. did so that *same* day with the test being negative for the presence of drugs. D.L. also reentered a new residential treatment program in early to mid-July 2013 and was in that program and ostensibly doing well in it at the time of the contested disposition hearing, when the court ordered reunification services for her.

The record also shows the bond between D.L. and her son G.L. strengthening over the course of time. Indeed, in the April 22, 2013 addendum report, social worker Onstott described a visit between D.L. and G.L. at Las Colinas that went well, where D.L. spoke "warmly" to, and played games with, her son. In the May 13, 2013 addendum report, Onstott again described a visit between D.L. and G.L. that had gone well, where D.L. told her son she loved him, played with him during the entire visit and gave G.L. the "space" he needed. Onstott also indicated in her report that D.L. called her son regularly and always asked the caregivers about her son's welfare.

In the June 5 addendum report, Onstott reported the visit between D.L. and her son went "very well" and, for the first time, G.L. immediately went to his mother's outstretched arms on seeing her and they played, spoke, hugged and kissed *throughout* the visit. And, when the visit ended, Onstott reported D.L. told G.L. that she could not wait to see him again and that she loved him, as the two hugged and kissed. Also during this visit, D.L. told Onstott she was beginning to process the guilt from not caring for her other children and was enjoying the parenting classes she was receiving at Las Colinas.

The June 24 addendum report showed that D.L. wanted services because she did not want to give up on G.L. and stated she would "fight" to keep him. This report also showed that D.L. was gaining insight into her behaviors that led her to chemical addition, including her recognition that it was up to her to get well, that she needed "help and guidance" to do so and that, if she could do so, she could be a mother for "once" to her child.

The July 15 addendum report shows D.L. continued efforts to deal with her chemical dependency even after she was dismissed from the Serenity House.

Thus, we conclude from the foregoing that there is sufficient evidence in the record to support the finding by clear and convincing evidence that reunification, as opposed to reunification services, was in the best interest of G.L. as set forth under subdivision (c) of section 361.5, including substantial evidence supporting the implied finding of the court there is a "'reasonable basis to conclude'" that reunification is possible between D.L. and G.L. (See *In re William B.*, *supra*, 163 Cal.App.4th at pp. 1228-1229;

19

see also *In re Jesse W.* (2007) 157 Cal.App.4th 49, 66 [noting that a court in exercising its discretion on the issue of best interest of the child has the "ability to evaluate whether the parent will utilize . . . services and whether those services would ultimately inure to the benefit of the minor"].)

That there is evidence in the record supporting the opposite finding—as pointed out by G.L., including D.L.'s long history of drug abuse and her failure to reunify with her other children—does not mean the court abused its discretion in finding it was in G.L.'s best interests to reunify with D.L. (See *In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881 [noting a court of review "will not disturb the court's determination unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination," and noting that "[w]hen two or more inferences reasonably can be deduced from the facts, [a reviewing court has] no authority to reweigh the evidence or substitute [its] judgment for that of the juvenile court"].)

## DISPOSITION

The order finding D.L. is entitled to reunification services is affirmed.

BENKE, Acting P. J.

WE CONCUR:

NARES, J.

McDONALD, J.