Filed 11/16/15  In re J.W. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.W. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E062802 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J256470 & J256471) |
| v. | OPINION |
| B.W. et al., | |
| Defendants and Respondents; | |
| J.W. et al., | |
| Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Appellants.

Jean-Rene Basle, County Counsel and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Respondent B.W.

No appearance for Defendant and Respondent C.H.

No appearance for Defendant and Respondent T.J.

San Bernardino County Children and Family Services (CFS) removed C.H. (daughter) and J.W. (son) from the custody of B.W. (mother), when they were 12 and 8 years old, respectively. The juvenile court determined it had jurisdiction over their placement because the children are at risk of severe physical harm due to abuse by their mother and her inability to provide adequate supervision and protection. (Welf. & Inst. Code,[1] § 300, subds. (a) & (b).)[2] The juvenile court also determined reunification services were not required because of the nature of their prior removal and the prior removal of their brother. (§ 361.5, subd. (b)(3) & (10).) The court nevertheless ordered reunification services on the basis of its finding, by clear and convincing evidence, that reunification was in the best interest of the children. (§ 361.5, subd. (c).)

Son and daughter challenge the sufficiency of the evidence to support the juvenile court's finding that reunification is in their best interest. CFS submitted a letter brief joining and adopting the brief submitted on behalf of the minors. (Cal. Rules of Court,

---

[1]     Further unlabeled statutory references are to the Welfare and Institutions Code.

[2]     The juvenile court also determined it had jurisdiction based on the fathers' inability or unwillingness to provide adequate care. (§ 300, subd. (g).)

rule 8.200 (a)(5).) We hold the juvenile court did not abuse its discretion because the evidence is sufficient to support its finding. Accordingly, we affirm the judgment.

# I

## FACTUAL BACKGROUND

On December 19, 2012, daughter, son, and their baby brother were removed from the custody of their mother after the baby, then less than five months old, suffered severe non-accidental trauma, with injuries including broken bones, retinal damage, and subdural hematoma. Initially, the authorities accused mother and her then-boyfriend, T.P. (boyfriend), of injuring the baby, but mother was exonerated of responsibility for the baby's injuries. She testified she does not know who hurt the baby, but she indicated either her daughter or her boyfriend could be responsible. Eventually, the daughter admitted to causing the baby's injuries. However, months later she recanted and said she did not know who had injured her baby brother. The juvenile court placed all three children in foster care and ordered the mother to participate in reunification services.

On August 20, 2013, the juvenile court returned the daughter and son to the custody of their mother. On February 26, 2014, the juvenile court returned their baby brother to her custody and dismissed the daughter and son as dependents. At that time, the juvenile court ordered mother not to leave the children unsupervised with her boyfriend or allow him to provide care for the children. Mother also accepted a safety plan for the baby requiring that she not leave him in the care of his siblings.

Mother violated those conditions. According to the social worker who testified at trial, mother admitted she had left her daughter with the baby to take her son to school on

3

a few occasions when "[the baby] may be asleep, so she wouldn't have to take him out in cold weather or incidents such as that." Mother testified this occurred on only two or three occasions. Daughter told social workers that, between February and July 2014, mother allowed her boyfriend to visit her family's home on several occasions and allowed daughter to visit the boyfriend's home three times. Mother denies any such visits occurred. Mother admits she took her son and baby to the boyfriend's apartment on July 1, 2014, and that she left them alone with the boyfriend while she took a nap.

The visit to the boyfriend's apartment precipitated this removal action. According to a July 1, 2014 police report, mother, son, and baby went to the boyfriend's home for a barbeque. Mother testified she visited only to pick up her possessions and the boyfriend invited them to stay for a meal after they arrived. In any event, while at the boyfriend's home, mother had a couple of alcoholic drinks and became tired. She went to the bedroom to take a nap and left the baby asleep on the couch and her son and boyfriend playing video games. Sometime later, the baby began to cry. Mother and her son reported that her boyfriend became upset, went into the bedroom, and started yelling at her to take her baby and leave his apartment. Mother and her son claimed that, in the presence of the children, the boyfriend pushed the mother down and then dragged her by her hair out of the apartment. The boyfriend described the altercation differently. He claimed he woke mother to take care of the baby, but she got upset at him and began making a mess of his apartment. Mother denied these allegations. According to the police report, son held the baby during the altercation and got him out of the apartment. Mother suffered a cut during the altercation. Son and the baby were hit by a thrown

4

water bottle, and the baby suffered a bruise on his head. Mother called the police, who arrested the boyfriend on a charge of domestic abuse (Pen. Code, § 273.5, subds. (a) & (b)).

Mother subsequently sought to end all contact with the boyfriend. At first, she obtained a criminal restraining order against him. In September, she obtained a family court restraining order that protected both herself and her children. At the time of the hearing in this case, she had not seen the boyfriend outside of court since the events of July 1, 2014 and was attending a domestic violence support group once a week. She also began counseling in July 2014, after the domestic violence incident. Mother later expressed remorse for violating the juvenile court order against allowing contact between the boyfriend and her children and said she would not do so again.

After CFS learned of this incident, it removed the children from mother's custody and filed new dependency petitions for the daughter and son under Welfare and Institutions Code section 300, subdivisions (a), (b), (c), and (g). CFS alleged mother physically abused the children, failed to protect them from her boyfriend, had a history of domestic violence, consumed excessive alcohol, and had mental health problems. The juvenile court held a detention hearing on September 18 and 19, 2014 and ordered the children detained. On December 8 and 9, 2014, the juvenile court held a jurisdiction hearing. The juvenile court heard the testimony of mother and Social Worker Sandra Hargis. Both witnesses testified as to the facts recounted *ante*, as well as evidence of physical abuse and other incidents of domestic violence.

5

Hargis testified about one incident of alleged physical abuse directed against the son. The son told her that mother scratched his neck when she grabbed his shirt on one occasion. The daughter claimed her mother got frustrated with the son and was sitting on him and choking him. Mother contested her daughter's story. She admitted to Hargis that "she did grab his shirt out of frustration." Mother testified she "asked [son] to do his homework. And he kept crying and taking his time. An hour or two passed. And I was just talking to him, and he was being disrespectful. So I did grab him and told him to calm down and do his work . . . [a]nd accidentally scratched him . . . [on] [h]is neck area." Mother testified that nothing like that incident had ever occurred before and that she does not use physical punishment with her son. Son reported to Hargis that the scratch occurred when mother grabbed his shirt. Hargis conceded that "there is no other incident regarding [son] and the mother and the alleged physical abuse." Hargis testified that at the time of his removal from his mother's custody, son was healthy and "was well groomed and appeared to have received appropriate care."

Hargis also testified about three alleged instances of physical abuse against the daughter. The daughter claimed that in July 2014, her mother began "hitting her all over." On two other incidents, she reported that her mother dragged her by her hair and hit her and pushed her to the floor and kicked her. Mother contradicted her daughter's stories. According to mother, in the first incident, "[daughter] and I were in the house folding clothes, [daughter] threw something at me. And she got up and ran, so I followed her. And she came up in my face, and I grabbed her by her shirt. . . . [and] told her to not talk to me like that, don't disrespect me, because she raised her hand at me." Mother

6

testified that on another occasion, she had "asked her to check in at a certain time. . . . And it was getting dark, and she didn't. . . . She finally came in. And I did grab her. And I told her that she was supposed to come in." Mother said she grabbed her daughter "[b]y the shirt" on that occasion, but denied hitting her. She also denied using physical punishment with her daughter on other occasions. Hargis conceded that, when she was taken into custody, daughter had no scars, bruises, or other marks that might indicate physical abuse, appeared to be healthy, and "was very clean, [and] dressed appropriately."

Hargis also testified about other instances of domestic abuse. She testified there were "some domestic issues with . . . [daughter's] father at one point," though she did not provide details. Mother testified she and her daughter's father had a verbally abusive relationship 13 years ago. Hargis testified that in addition to the July 2014 incident described *ante* there was another incident of domestic violence with the boyfriend in September 2013. Mother characterized the September 2013 incident as "face-to-face arguing" in which "[son] got hurt" accidentally. According to mother, "Me and [boyfriend] was arguing. I went to grab for the phone charger. He pulled back. I lost my balance. And I didn't know that [my son] was behind me, and I fell. And he fell and hit his head on the TV."

Finally, Hargis testified about positive aspects of mother's parenting and evidence of her progress since first obtaining reunification services. Hargis agreed mother "was often involved with school and with medical appointments and had contact with many people in the community during the course of the supervision of this case." She testified

7

that other than the incident described *ante*, she was not aware of mother leaving her son with any other inappropriate caregiver. She testified that social workers who visited mother's home did not discover "anything that was negative." The social worker who visited "report[ed] that Mother was taking good care of [the baby] and maintaining his [medical] appointments" and saw no "signs of physical abuse on the children in the home." Neither daughter nor son exhibits signs of emotional problems. The children went to school regularly, and mother "always cooperate[d] with interviews and visits with social services." At supervised visits, mother behaves appropriately with the children and the children "seem to enjoy" the visits. Hargis agreed that "any of these three children would benefit from maintaining a relationship with their mother."

Daughter also reported that her mother drank excessively. However, Hargis testified a social worker who visited the home found no evidence of alcohol use and Hargis concluded there was no support for the alleged alcohol problem. Hargis also testified there was no support for the allegation that mother had mental health issues.

After hearing the evidence, the juvenile court determined all three children have suffered or are at risk of suffering serious physical harm by a parent or caregiver (§ 300), giving the court jurisdiction over their placement. The juvenile court found daughter and son are at risk because mother has physically abused them, allowed inappropriate caregivers to supervise them, has a history of domestic violence, and because their fathers are unable or unwilling to provide appropriate care. It also found that daughter was at risk because her father did not protect her despite the fact that he knew or should have known she was at risk in mother's care. The juvenile court dismissed allegations that

8

daughter and son were at risk because of mother's excessive alcohol consumption, mental health issues, failure to address their needs for psychological intervention, and threats of abandonment.

In addition, the juvenile court found that daughter and son had been previously adjudicated dependents due to physical abuse, returned to their mother, and removed again due to physical abuse. (§ 361.5, subd. (b)(3).) The juvenile court separately terminated reunification services for the baby, and found that daughter and son were in a household where the problems with the baby's treatment had not been addressed. (§ 361.5, subd. (b)(10).) As a result of these findings, the juvenile court was not required to order reunification services. (§ 361.5, subd. (c).)

However, the juvenile court determined, based on the hearing evidence that "it will be in the best interest of those two children to order services for the mother" and therefore ordered reunification services. (§ 361.5, subd. (c).) The juvenile court based its determination on several factual findings: (i) "the social worker indicated on the stand that all the children would benefit from maintaining a relationship with the mother," (ii) "the mother . . . put herself back into counseling after the July incident . . . on her own," (iii) the mother "did ultimately get a protective order . . . to protect her children," (iv) the mother accepted responsibility and was regretful for "allowing [the boyfriend] into her life, [and] she recognized the problem . . . [a]nd she's now trying to deal with it," (v) the mother's "efforts with respect to [the baby] and the making of each and every appointment . . . reflect[] a good degree of parenting ability," (vi) "[Daughter] and [son] are in school and have been put into a setting that is having an advance in school and

9

having their basic needs met," (vii) the mother made reasonable efforts to address the problems that led to the removal of her children, (viii) "on balance . . . the mother could offer a stable environment for the children," and (ix) it is likely "that reunification will succeed."

The juvenile court concluded "the mother needs additional services to assist her both in handling parenting, handling the children" and "that the mother is fit to continue to parent these children from the evidence that I have reviewed." Accordingly, the juvenile court ordered that mother participate in further reunification services and scheduled a 6-month review hearing for July 6, 2015.

## II

## DISCUSSION

The minors contend "there was insufficient evidence that offering Mother reunification was in the children's best interests" and ask us to "reverse the juvenile court's order of services for Mother." We hold substantial evidence supports the juvenile court's opinion and therefore affirm.

Mother contends the issues appellants raise on appeal are moot because "the court ordered the Department [to] provide [mother] with six[]months of services" and she will have received those services before we resolve the appeal. Respondent misunderstands the juvenile court order. The court ordered reunification services for up to twelve months and scheduled a 6-month review hearing for July 6, 2015. We take judicial notice by separate order of the July 6, 2015 juvenile court minute orders, which continued reunification services and scheduled a twelve-month review hearing, and on their basis

10

conclude the issues on appeal are not moot. (See *In re Karen G.* (2004) 121 Cal.App.4th 1384, 1390 [holding appellate court may take judicial notice of postjudgment proceedings in the juvenile court to determine whether appeal is moot].) We recognize the Supreme Court has stated postjudgment evidence may not, except in extraordinary circumstances, be used as a basis to reverse a termination of parental rights on appeal. (*In re Zeth S.* (2003) 31 Cal.4th 396, 399-400, 413-414.) However, because this appeal is not from an order terminating parental rights and we are taking judicial notice of a court record to affirm, our consideration of the minute orders is not prohibited. (See *In re Karen G.*, *supra*, at p. 1390.)

"A juvenile court has broad discretion when determining whether further reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion. [Citation.]" *In re William B.* (2008) 163 Cal.App.4th 1220, 1229. A juvenile court can abuse its discretion by failing to consider factors important to determining whether reunification is in the best interest of the child. (See, e.g., *In re Ethan N.* (2004) 122 Cal.App.4th 55, 64-67 [holding juvenile court abused its discretion by failing to consider the child's "need for stability in directing that reunification services be provided" where the child "was detained within days of his birth and thereafter remained with the same caretaker, a relative who was ready and willing to provide long-term care"].) Where, as here, a party challenges the sufficiency of the evidence supporting the court's finding on which it based its best interests determination, we review the record to determine whether substantial evidence supports the juvenile

11

court's findings. (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216 (*Albert T.*) ["When the sufficiency of the evidence to support a juvenile court's finding or order is challenged on appeal, the reviewing court must determine if there is substantial evidence, contradicted or uncontradicted, that supports it"]; *In re Harmony B.* (2005) 125 Cal.App.4th 831, 843 [Fourth Dist., Div. Two] [affirming juvenile court finding "that reunification would not be in [the child's] best interests" because "substantial evidence supports the juvenile court's finding"].)

Under substantial evidence review "we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses." (*Albert T.*, *supra*, 144 Cal.App.4th at p. 216.) "We must resolve all conflicts in support of the determination and indulge all legitimate inferences to uphold the court's order . . . [and] may not substitute our deductions for those of the trier of fact." (*Ibid.*) "[W]e must decide if the evidence is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the court's order was proper based on clear and convincing evidence." (*Curtis F. v. Superior Court* (2000) 80 Cal.App.4th 470, 474.)

The statutory scheme governing juvenile dependency "is designed to allow retention of parental rights to the greatest degree consistent with the child's safety and welfare, and to return full custody and control to the parents or guardians if, and as soon as, the circumstances warrant." (*In re Ethan C.* (2012) 54 Cal.4th 610, 625.) Thus, in the ordinary case where minors have been removed from the custody of their parents and declared dependents, "child welfare services, including family reunification services,

12

must be offered." (*Id.* at p. 626; see also § 361.5, subd. (a).) "When offered, reunification services must be provided for at least six months unless earlier terminated for cause (§ 361.5, subd. (a)(2)), and for up to 24 months when it appears such extended services will result in the dependent child's return to the parent's or guardian's custody." (*In re Ethan C.*, *supra*, at p. 626.)

In some situations, however, the parent can lose the presumption of reunification services. Relevant to this case, subdivision (b)(3) of section 361.5 provides: "Reunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence . . . [¶] . . . [t]hat the child or a sibling of the child has been previously adjudicated a dependent . . . as a result of physical . . . abuse, . . . removed from the custody of his or her parent or guardian, . . . returned to the custody of the parent or guardian from whom the child had been taken originally, and . . . the child is [again] being removed . . . due to additional physical . . . abuse." The juvenile court correctly determined that this provision applies to daughter and son.[3]

As a result, subdivision (c) of section 361.5 governs. It provides "[t]he court *shall not* order reunification for a parent or guardian described in paragraph (3) . . . of subdivision (b) *unless* the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (Italics added.) In this case, the juvenile

---

**3** The juvenile court also found that subdivision (b)(10) of section 361.5 applies to daughter and son. Subdivision (b)(10) is an alternate basis for holding reunification services are presumptively inappropriate. Because it does not change our analysis whether the juvenile court correctly determined mother overcame the presumption, we do not discuss that basis for imposing the presumption separately.

13

court properly applied section 361.5, subdivision (c), considered the evidence presented at the hearing, and determined that mother had overcome the statutory presumption against reunification services because clear and convincing evidence showed that reunification with their mother would be in the best interest of the children.

In determining the children's best interests, the juvenile "court should consider 'a parent's current efforts and fitness as well as the parent's history'; '[t]he gravity of the problem that led to the dependency'; the strength of the bonds between the child and the parent and between the child and the caretaker; and 'the child's need for stability and continuity.' " (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164, quoting *In re William B.*, *supra*, 163 Cal.App.4th at pp. 1220, 1228.) "[A]t least part of the best interest analysis must be a finding that further reunification services have a likelihood of success." (*In re G.L.*, *supra*, at p. 1164.)

We have reviewed the record and conclude the juvenile court did not abuse its discretion when it found reunification is in the best interest of daughter and son. The juvenile court made detailed findings, including that, notwithstanding her shortcomings, mother was providing adequate care and had a generally good relationship with her children. The juvenile court noted that Social Worker Hargis "indicated on the stand that all the children would benefit from maintaining a relationship with the mother." She also reported that mother "was often involved with school and with medical appointments," "was taking good care of [the baby] and maintaining his [medical] appointments" and that the other "children [went] to school regularly." Hargis testified mother behaved appropriately with the children during supervised visits, which the children "seem to

14

enjoy." All this testimony, which has further support in the testimony of mother herself, supports the juvenile court's conclusion that mother had demonstrated a good degree of parenting ability and "is fit to continue to parent these children."

The juvenile court also found that mother had made reasonable efforts to address the domestic violence issues that led to the removal of her children. This finding too was supported by substantial evidence. The record shows that after the July 1, 2014 episode of domestic abuse, which occurred in the presence of her son and baby, mother sought to terminate her relationship with her boyfriend and protect herself and her children from future exposure to his abuse. She reported the abuse to the police and obtained a criminal protective order. In addition, mother accepted responsibility for exposing her children to her boyfriend and was regretful for "allowing [him] into her life, [and] she recognized the problem . . . [a]nd she's now trying to deal with it." As the juvenile court noted, mother "put herself back into counseling after the July incident . . . on her own," and without prompting "g[o]t a protective order . . . to protect her children." As of the date of the hearing in juvenile court, mother had not seen the boyfriend outside of court for over five months. The juvenile court reasonably concluded that the mother made reasonable efforts to address the problems that led to the removal of her children.

The same evidence discussed *ante* supports the juvenile court's findings that mother has a significant bond with her children and "could offer a stable environment for the children." The finding that she has a significant bond with her children is supported by her involvement in school and medical appointments, her conduct at supervised visits, and the fact that the children enjoy the visits. In addition, based on the children's foster

15

placement having lasted less than a year, the court found there was "not enough time for there to be bonds with the foster parents," and reasonably concluded mother's bond was stronger. The juvenile court's finding that mother could provide a stable environment was also supported by the same evidence, as well as the fact that "prior to their removal, the children were in a stable relationship with the mother in a stable home." The court recognized that "the incidents of domestic violence . . . altered that to some degree." However, the court's conclusion mother could again provide a stable home for the children is supported by the evidence she took decisive steps after July 1, 2014 to exclude the boyfriend from her life, obtain protection for her children, and engage in counseling. It has further support in the evidence that under mother's care the children were "well groomed and appeared to have received appropriate care" and appeared to be healthy.

The minors contend the juvenile court erred because it did not give sufficient weight to the gravity of the abuse. They point to her son's statements about being exposed to the boyfriend's violence against mother and daughter's statements that mother drank excessively and had physical outbursts directed at both children. These statements do not undermine the reasonableness of the juvenile court's finding. The court noted that the "overall problem in this case is that the mother got wrapped up in a relationship with [the boyfriend] that was harmful to everyone, including herself, and certainly her children . . . ." However, as discussed *ante*, after the incident of domestic abuse that triggered these proceedings, mother took independent and decisive action to address that danger. As of the hearing, mother had not seen the boyfriend outside of court since the July 1, 2014 incident. The allegations of excessive alcohol use are not supported. Social

16

Worker Hargis reported finding no indication of alcohol use in mother's home and no other evidence that mother abused alcohol, and the juvenile court dismissed alcohol abuse as a reason to detain the children.

As for the abuse mother herself inflicted on her son and daughter, there is conflicting evidence about its gravity. Mother admitted she had scratched her son when she grabbed his shirt out of frustration and her son confirmed her testimony. Mother admitted she had grabbed her daughter on a few occasions, but denied hitting her. Daughter reported these incidents were more violent. Meanwhile, Social Worker Hargis conceded she knew of only one incident of mother physically abusing son and agreed that when he was taken into custody there were no signs of abuse other than "a minimal scar on his neck." She conceded he appeared healthy and "was well groomed and appeared to have received appropriate care." She also conceded that daughter had no scars, bruises, or other marks that might indicate physical abuse, appeared to be healthy, and "was very clean, [and] dressed appropriately." Hargis reported that, according to the social worker who worked with mother for a year, there were no signs of abuse during supervisory visits. Given the conflicting testimony, the apparent health and well-being of the children, and the fact that exposure to domestic violence was the principal reason for removing the children, the juvenile court could reasonably have found reunification to be in the children's best interests despite the incidents of abuse by mother that formed part of the basis for their detention.

The court also found that reunification is likely to succeed. That finding is supported by the evidence that mother worked to maintain a close relationship with her

17

children during removal and, after the July 1, 2014 incident, voluntarily and immediately got back into counseling and domestic violence counseling. A juvenile court exercising its discretion has the "ability to evaluate whether the parent will utilize . . . services and whether those services would ultimately inure to the benefit of the minor." (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 66, 68.) We hold the juvenile court here had a "reasonable basis to conclude" that mother will avail herself of reunification services and that reunification will succeed. (See *In re William B., supra,* 163 Cal.App.4th at pp. 1228-1229.)

We conclude there is sufficient evidence to support the juvenile court's finding by clear and convincing evidence under section 361.5, subdivision (c) that reunification is in the best interests of the minors.

The minors argue there is evidence in the record supporting the opposite finding. Even if that were correct, such evidence does not establish the court abused its discretion in finding it was in their best interests to reunify with their mother. (*In re G.L.*, 222 Cal.App.4th 1153, 1166.) An appellate court "will not disturb the [juvenile] court's determination unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881; see also *In re G.L.*, *supra*, at p. 1166.) "When two or more inferences reasonably can be deduced from the facts, [an appellate court has] no authority to reweigh the evidence or substitute [its] judgment for that of the juvenile court." (*In re G.L.*, at p. 1166.) We decline the minors' invitation to reweigh the evidence in this case.

18

Accordingly, we affirm the juvenile court's judgment that reunification is in the best interests of the children.

## III

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>RAMIREZ</u>
P. J.

We concur:

<u>HOLLENHORST</u>
J.

<u>CODRINGTON</u>
J.

19