Filed 6/6/22 C.B. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| C.B., | |
| Petitioner, | E078770 |
| v. | (Super.Ct.Nos. J287910 & J287911) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | |
| Respondent; | OPINION |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

Petition for extraordinary writ. Steven A. Mapes, Judge. Petition denied.

Jenae McDonald for Petitioner.

No appearance for Respondent.

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for

Real Party in Interest.

1

## INTRODUCTION

Defendant and appellant C.B. (father) challenges a juvenile court's order denying him reunification services pursuant to Welfare and Institutions Code[1] section 361.5, subdivision (b)(6), as to his children, C.B., Jr., and J.B. (the children). He contends the court erred in not providing him services since they were in the children's best interests. We affirm.

## PROCEDURAL BACKGROUND

On January 26, 2021, the San Bernardino County Children and Family Services (CFS) filed petitions on behalf of C.B., Jr., who was nine years old at the time, and J.B., who was six years old. Both petitions alleged that the children came within the provisions of section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (f) (caused another child's death through abuse or neglect), (g) (no provision for support), (i) (cruelty), and (j) (abuse of sibling).

The social worker filed a detention report and stated that CFS received an immediate response referral alleging physical abuse of the children by the stepmother, T.B. (mother).[2] It was reported the children's sibling, C.N., got dizzy, fell, and hit her head. She became lethargic and mother attempted to feed her oatmeal, but C.N. did not respond. Mother gave her Narcan and called the police. When they arrived, C.N. was unconscious. She was taken to the hospital where she was pronounced dead. The social

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise noted.

[2] Mother is not a party to this writ.

2

worker reported that C.N. had a large hematoma between the center of her eyes, bruising on her knees, and bite marks on her thigh.

On January 21, 2021, the social worker met with two police detectives who said they were getting conflicting statements from mother and the children about what occurred. The officers also stated the family home was reported to be "filthy" with empty bottles of chemicals and medications all over. A detective reviewed photos of C.N., which revealed bruises to her abdomen, one of which was linear, a bruise to her temple, a rash under her armpit, and a patch of her hair, which appeared to be ripped from the scalp.

The social worker interviewed father, who stated he was not at home when the incident happened, did not know what Narcan was, and did not know mother had it in the home. He said he just found out that day when his wife told him the Narcan was for the suboxone she was taking from an online drug treatment program. Father said he did not know how long mother has been using suboxone, or what it was for.

The court held a detention hearing on January 27, 2021. The court detained the children with the paternal grandparents, ordered services pending the development of a case plan, and set the matter for a jurisdiction/disposition hearing.

*Jurisdiction/Disposition*

On or around February 23, 2021, the social worker filed a jurisdiction/disposition report and asked for a continuance to further investigate the allegations that were reported, conduct interviews, and obtain police reports and the county coroner's report. The social worker reported that on February 8, 2021, father stated he was unaware there

3

was bruising to C.N.'s right arm, and explained that C.B., Jr., caused the bruising to her face by hitting her with a closet rod. Father said he did not see it happen, but mother told him. Father did not know where the linear marks on C.N.'s stomach came from. When asked about the bruising to her legs, he said C.N. broke her leg four months prior. Father said he did not discipline the children, and he never had concerns regarding the way mother disciplined them. When asked what kind of physical discipline was used, he stated, "Time outs and corners." Father reported that he had never been concerned about any marks or bruises on C.N. He also did not believe her death was a result of abuse or neglect by himself or mother, but believed her death was a result of cardiac arrest.

The social worker spoke with mother, who said she had been sick for a couple weeks, so the home did get messy, and she did have medication and bleach out, but there were no chemicals. Mother said father smoked marijuana for pain, and she denied that marijuana, chemicals, or medication were left out within reach of the children. Father said the marijuana was kept in the bedroom or the garage, locked, and the children had no knowledge of his marijuana use.

The social worker concluded there was a detriment to the safety and well-being of the children if they were to be returned to the custody of mother and father.[3] The social worker added that at the time of the detention hearing, the structured decision-making risk assessment was documented as "Very High." She also reported that father and

---

[3] The report mentions another child, J.H., but he has a different father and is not a subject of this writ.

mother agreed to participate in outpatient substance abuse counseling, individual counseling, and parenting classes; however, father did not believe he needed counseling.

The social worker filed an addendum report and stated that on March 24, 2021, she received a drug test record for father showing four positive tests. On April 5, 2021, the social worker received progress reports for the parent education program, which showed that father had attended four of 12 classes. She also received progress reports for his individual counseling, and father had attended five of eight required individual sessions.

The court held a hearing on April 13, 2021, and continued the matter to July 20, 2021. The matter was then continued to September 28, 2021.

On July 19, 2021, the social worker filed a memorandum with additional information for the court. She reported that she spoke with someone at the county coroner's office who said the cause of C.N.'s death was ruled as undetermined. The social worker also reported that father completed his parenting and outpatient treatment program and recommended that he participate in family counseling and continue to complete random drug tests. The social worker recommended that father be provided with reunification services.

On September 20, 2021, the social worker filed another memorandum with additional information for the court and reported that she had received the ICWA (Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.)) Qualified Expert Witness

Declaration prepared by Dr. Karen Wynn.[4] Dr. Wynn reported that she reviewed 399 pictures of the family home, and they showed "general chaos, untidy, unclean and unhealthy conditions." The pictures showed "stained carpet, oatmeal vomit on tiled floors and on the couch. Stained tile around the dog dishes. Tubs and baskets filled with toys, dirty clothes, bedding. Every room in the house, including the garage and the outside porch fits this description of filthy chaos." She also commented that she found it hard to believe father did not know about the cuts and bruising that covered most of C.N.'s body. Dr. Wynn also opined that father was involved "in a couple of aspects of marijuana in the growing of bud and the cooking of 'wax' or 'honey' considering all the bags of bud and the operational 'kitchen' that was located in the master bedroom and all the firearms needed to protect the investment." Dr. Wynn noted father's positive drug tests and the services he had participated in and concluded that he had not "demonstrated his ability to attempt to stay sober and free from illegal drugs."

On September 23, 2021, the social worker filed a second addendum to the jurisdiction/disposition report and reported that she spoke with a pediatrician at the Children's Assessment Center (CAC) who expressed her concerns that C.N.'s injuries were suspicious for abuse. Also, the social worker met with child C.B., Jr., on September 13, 2021, and asked if he wanted to return home. He said, "I will get hit and all the stuff she did to me. I don't want to go back." He said mother would make C.N. eat oatmeal, even though she did not like it, and would yell at her; C.N. got sick and kept throwing up.

_____

[4] Dr. Wynn was retained since J.B. and J.H. had been determined to be Indian children.

C.B., Jr., further stated mother would yell really loud, and he did not know why father did not hear it, but father was always in the garage. Mother would also make C.B., Jr., eat oatmeal and would shove the spoon in his mouth until it was almost down his throat. C.B., Jr., said he wanted to live with his grandparents. The social worker reported that child J.B. also wanted to live with her grandparents because she said mother "was mean" to C.B., Jr. The social worker further reported that she received a toxicology report for C.N., and it showed she had cannabinoids present. She commented that "[t]his may be significant as the parents deny the children ever being exposed to marijuana." The social worker also reported that father completed outpatient substance abuse treatment, parent education, and individual counseling, and he was currently participating in family counseling with C.B., Jr. She still recommended reunification services for father.

On December 16, 2021, the social worker filed a third addendum to the jurisdiction/disposition report and recommended that services be bypassed for father pursuant to section 361.5, subdivision (b)(6), and mother pursuant to section 361.5, subdivision (b)(4). The social worker cited the recommendations of Dr. Wynn. She also noted that the children had disclosed physical abuse to C.B., Jr., and C.N. and that the parents continued to deny any physical or emotional abuse in the home to the children. Furthermore, although the parents had completed individual therapy, substance abuse treatment, parent education, anger management, and family therapy, they were not accepting of the children's disclosures. Therefore, the social worker concluded that it would not be safe to return the children to father. She added that the children did not feel safe with him, as he failed to protect them.

7

The court held a continued hearing on March 23, 2022, and county counsel asked the court to bypass services for father under section 361.5, subdivision (b)(6). She asserted that C.B., Jr., reported to the social worker that mother would hit and yell at C.N. and make her stay in her room all day. He also said she would force-feed him and C.N. until they threw up. J.B. confirmed those facts and added that mother would pull C.N.'s hair and hit her and C.B., Jr., with spoons and cause them to bleed. During the CAC interviews in April, both children reported ongoing severe physical abuse by mother. County counsel argued that neither parent had taken responsibility for what happened to C.N. or acknowledged there had been ongoing abuse in the home for years. She argued that father was in the home, knew of the abuse, and failed to stop it and protect his children. She asserted it was implausible that father had no idea about the abuse going on, especially in light of the fact that C.N. was covered in bruises, scratch marks, and bite marks, and had missing hair when she died.

The court sustained the petitions, declared the children dependents, and removed them from the parents' custody. It recited the evidence and stated that C.N. had been tortured over the years, and it could not "see anything other than the Dad having consented." The court bypassed father's reunification services pursuant to section 361.5, subdivision (b)(6), and set a section 366.26 hearing.[5]

---

[5] The court also bypassed mother's services.

DISCUSSION

The Court Properly Bypassed Father's Services

Father does not dispute the court's bypass of his services under section 361.5, subdivision (b)(6). As respondent points out, father only mentions section 361.5, subdivision (b)(4), which the court applied to mother. Rather, he argues that he made substantial progress in his predisposition services, completing his parenting program, an outpatient treatment program, and individual therapy sessions. He claims his actions show he has taken responsibility for "not taking a bigger role as a parent in watching out and protecting his children from his wife . . . who was the main perpetrator in this case." He then simply concludes that "the children deserve the right to grow up with a father who is working towards deserving them," and that the court's decision to bypass his services was not supported by the evidence. Father appears to be arguing the court erred in not finding that reunification services were in the children's best interests, pursuant to section 361.5, subdivision (c). We disagree.

A. *Relevant Law*

"When a child is removed from parental custody, the juvenile court may order reunification services to assist the parents in reuniting with the child. [Citation.] However, if any of the circumstances set forth in section 361.5, subdivision (b) are established by clear and convincing evidence, 'the general rule favoring reunification is replaced by a legislative assumption that offering [reunification] services would be an unwise use of governmental resources' and the court may bypass services. [Citations.] Nonetheless, services may still be provided if section 361.5, subdivision (c) is shown to

apply." (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1193.) Section 361.5, subdivision (c)(2), provides that the court is prohibited from granting reunification services to a parent described in any one of the bypass provisions of subdivision (b) "unless [it] finds, by clear and convincing evidence, that reunification is in the best interest of the child."

" 'A juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion.' " (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164-1165 (*G.L.*).)

B. *The Court Properly Concluded It Was Not in the Children's Best Interests to Order Reunification Services*

"In determining the children's best interests, the 'court should consider "a parent's current efforts and fitness as well as the parent's history"; "[t]he gravity of the problem that led to the dependency"; the strength of the bonds between the child and the parent and between the child and the caretaker; and "the child's need for stability and continuity." ' " (*G.L.*, *supra*, 222 Cal.App.4th at p. 1164.) " '[A]t least part of the best interest analysis must be a finding that further reunification services have a likelihood of success.' " (*Ibid*.)

Here, the court properly found it was not in the children's best interests to provide reunification services to father. Father continued to deny any abuse took place in the home, despite all the obvious evidence to the contrary. He did not demonstrate any understanding of the gravity of the situation, despite his daughter's death while in his

10

care. This failure to show any understanding, take any responsibility, or accept the children's disclosures of mother's treatment of them in the home, despite already having completed individual counseling, parenting education, and family therapy, demonstrated that further reunification services would have little chance of success. Moreover, the children expressed they did not want to return to father, but wanted to live with their grandparents, which indicates that the bond, if any, between father and the children was weak.

In light of the evidence before it, we conclude the court did not abuse its discretion in determining that reunification services were not in the children's best interests.

DISPOSITION

The writ petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS

J.

We concur:

McKINSTER

Acting P. J.

MILLER

J.