Filed 6/1/23  T.S. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| T.S.,<br><br>　　　　Petitioner,<br><br>　　　　v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>　　　　Respondent;<br><br>STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>　　　　Real Party in Interest. | F085903<br><br>(Super. Ct. Nos. JVDP-22-000175, JVDP-22-000176)<br><br><br>**OPINION** |

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Ann Q. Ameral, Judge.

Tracy M. De Soto for Petitioner.

No appearance for Respondent.

Thomas E. Boze, County Counsel, and Lindy Giacopuzzirotz, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]　　　　Before Franson, Acting P. J., Peña, J. and Smith, J.

T.S. (mother) petitions this court for extraordinary writ review of a juvenile court order bypassing reunification services and setting a selection and implementation hearing for her children. Mother argues that the juvenile court violated her due process rights by bypassing reunification services pursuant to Welfare and Institutions Code section 361.5, subdivision (b)(6)[1] for her two sons, now 9-year-old D.S. and 4-year-old M.R.,[2] in the absence of a recommendation by the Stanislaus County Community Services Agency (agency) or notice that that bypass provision might be invoked. Even if the decision was not a violation of her due process rights, mother further argues it was nonetheless not supported by substantial evidence. We are not persuaded by these contentions and deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

*Background and Referral*

These dependency proceedings were initiated on July 19, 2022, when the agency received a referral from LeFlore County, Oklahoma indicating that it had been in the process of conducting a sexual abuse investigation regarding four minor children, including the children at issue here, D.S. and M.R. (the boys), as well as their twin half sisters, R.H. and D.H. (the girls).[3] The day following a forensic interview of the children, mother fled Oklahoma and returned to California, where she was tracked to Stanislaus County through records of her food stamp card purchases.

According to the social worker in Oklahoma, a family member, who was babysitting the children while mother and her live-in boyfriend (and presumed father of M.R.), R.R., were shopping, reported the children's disclosure of sexual abuse by R.R. It

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     M.R.'s first and last names are the same as his father's names, but he goes by his middle name.

[3]     The girls are not subjects of this petition.

2.

was reported that R.R. was making the children perform sexual acts on him. D.S. reported that he heard his sister, D.H., in her room throwing up, and that R.R. was in the room with her and D.H. told him to get out.

Oklahoma law enforcement and child welfare services responded to the home in early July 2022, and mother, while very combative and upset, agreed to allow the children to undergo a forensic interview.

D.H., then age 10, did not disclose any abuse but, when asked if anyone told her what to say, she replied that her mother had said, " 'hopefully you don't get taken away for something he didn't do.' "

Twin sister R.H. reported that they moved to Oklahoma because R.R. made them. She reported that her mother and R.R. fought all the time. R.H. was pensive and stated that she had not been told what to say in the interview, but that her mother had said she would get them all toys for doing their chores that day. R.H. reported feeling safe with her grandmother, but she had passed away. R.H. did not feel safe around R.R. when he was yelling or a neighbor named "Jimmy," who came over to the house often.

M.R., who was three years old at the time, was difficult to interview due to his young age. He did not reveal much, other than to say a "monster," who took his clothes off and threw him, was at the house and " 'we need to kill him.' "

D.S., then eight years old, promised to tell the truth, but stated, "if I tell the truth I get taken away" and "I don't want to get taken away." D.S. talked about a girl he knew who came over to the house and he told her that R.R. did " 'a lot of nasty stuff,' " but D.S. then said he was joking. He further stated that he told the girl that R.R. showed his sisters the fake " 'thing you go pee with' " and put it in their mouths. He stated, " '[t]hat happened for real.' "

Mother at first stated that the only charges R.R. had gotten were for marijuana. But she then stated he was arrested before because the girls had said he had touched them inappropriately, but they later said they were lying. Although she did not recall when this

3.

took place, she knew R.R. was not doing anything to her children. Mother claimed never to have been investigated by child welfare before and denied coaching her children on what to say.

Following the interviews, law enforcement went to the home and searched for R.R. They discovered pornography on a tablet the children had access to.

When the social worker next stopped to check on the family, she was informed they had fled to California. At that point, the Oklahoma social worker notified child welfare services in California.

On July 20, 2022, the agency social worker was informed by a detective in Oklahoma that R.R. was in jail in Oklahoma on the current charges and would be sent back to California for an outstanding warrant. The detective indicated concern with mother's ability to protect the children as she was "criminally un-protective." The detective relayed that there was a restraining order between the boys and R.R. and that the pornography found on the tablet in the home was "not adolescent pornography." The detective indicated that they were trying to locate records for a 2013 incident concerning R.R. being inappropriate with a minor, in addition to the 2019 allegations made by the girls. The social worker was able to confirm that R.R. had several profiles in the child welfare system, which included a 2013 sexual abuse referral substantiated against him for his "other daughter."

The social worker then contacted a California probation officer, who confirmed there were active warrants for both mother and R.R. Mother's warrant was for failing to surrender and probation had been unable to contact her because she left the state. The probation officer was unable to find mother, but contacted her stepfather, who had seen mother four days earlier and said mother, her father, and the boys were at a campground and the girls were with their biological father.

The social worker was able to interview the girls at their father's home. R.H. appeared nervous and shook her head "no" when asked if she had ever been touched

inappropriately. D.H. denied current abuse but stated that the earlier allegations involving R.R. were true and she denied ever telling her mother that they were not.

The girls' father stated that, in January 2022, mother told him she was moving to Oklahoma and he asked to see the girls before she left. She arrived earlier than expected when he was not home and took the girls without permission. The girls' father stated he was preparing to file paperwork for full custody.

After obtaining a protective custody warrant for the boys, the social worker began an intensive search for the family. Mother's father was located with mother's older daughter, B.S., age 14. B.S. said she had seen mother three days earlier, but mother's father denied seeing the family since they had returned to California.

On July 25, 2022, the social worker received a call from mother from a blocked number. Mother said she was out of town at a wedding in Reno and wanted to go over the allegations over the phone. The social worker insisted they meet in person. They arranged to meet a few days later. Mother did not provide a telephone number.

On July 26, 2022, the social worker made a visit to mother's stepfather, who said mother had come by the previous night to pick up her wallet and it was not possible mother had been in Reno, as he had just seen her. The boys were reported to be with another relative in Modesto, but he did not have the address. He reported that mother was using her sister's telephone number to "three way call" to avoid detection.

The social worker then received a call from mother, who stated she was " 'pissed off' " about receiving calls that she needed to speak to the social worker because they already had an appointment. Mother was rude and belligerent when informed that the social worker knew she had not been in Reno.

The boys were eventually found at the home of another woman, who said she was supposed to meet with mother that morning and get a notarized note for her to care for the boys while mother "handled her business." The protective custody warrant was

served and the boys were taken into custody. Information regarding the detention hearing was provided to the other woman to give to mother.

As the boys were being driven to their placement, D.S. stated he did not feel safe with R.R. and acknowledged that R.R. had hit him and was mean to him. He also stated his sisters were not safe with R.R. because he did " 'nasty things' " to them, "stuff they found on the tablet," referring to the pornographic videos on R.R.'s tablet found at the home. D.S. described how R.R. put his " 'private part' " into his sisters' mouths, causing them to throw up. D.S. indicated that his sisters told him R.R. did this to them every night when their mother left for work. D.S. denied that his mother knew about the incidents in Oklahoma, but acknowledged that she did know about other incidents in California.

During a telephone call, the social worker tried to convince mother to participate in a team decision making meeting (TDM) and then turn herself in on her warrants. Mother said she was not ready to do that and wanted to do the meeting by phone. Mother acknowledged daily marijuana use and occasional methamphetamine use. Mother claimed to have tried to leave R.R.

On July 27, 2022, mother was notified via text message that sexual abuse allegations against her were being substantiated due to her allowing the children to be in contact with R.R. after knowing he had sexually abused the girls in the past.

As of July 29, 2022, R.R. had been transferred from Oklahoma to Stanislaus County and was in custody.

*Section 300 Petition*

The agency filed a section 300 petition on July 29, 2022, alleging, under section 300, subdivision (b)(1), mother's failure to protect the boys and their siblings from sexual abuse by R.R., which was set forth in detailed allegations made by the children in both Oklahoma and California. It also included allegations of domestic

violence, which mother initially denied but then admitted, and substance abuse allegations of daily marijuana and periodic methamphetamine use by mother.

Under section 300, subdivision (d), it alleged sexual abuse by R.R. and that mother coached the children not to disclose the sexual abuse and threatened they would be taken away if they did. The petition further alleged prior child protective services history in which the girls alleged sexual abuse by R.R. in 2019, and a substantiated referral for sexual abuse against R.R.'s older daughter in 2013. It further included an allegation that, when interviewed, mother admitted this was the second time her children had said R.R. was inappropriate with them, and that D.S. had reported that mother knew about the 2019 incidents with the girls.

Under section 300, subdivision (g), it was alleged that R.R. was incarcerated and unable to provide for M.R., and that D.S.'s alleged father's whereabouts were unknown.

Demaris H. was listed as D.S.'s alleged father, address unknown. R.R. was listed as M.R.'s presumed father.

_Detention_

Neither mother nor R.R. appeared at the August 1, 2022, detention hearing, and it was put over to the following day when it was discovered that R.R. was in local custody.

On August 2, 2022, R.R. appeared in custody; mother did not appear. The juvenile court made detention orders and set a jurisdiction hearing for September 2, 2022. The court also made an emergency jurisdiction order under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) with follow up to occur with the state of Oklahoma. It was learned later that day that there were no open or closed court cases for either of the boys in Oklahoma.

Mother contacted the agency on August 15, 2022, and requested that counsel be appointed for her as she would like to participate in the case. A motion for appointment of counsel was set for August 22, 2022. Mother had appointments to meet with the social worker two times before the scheduled August 22, 2022, hearing, but she failed to keep

7.

them. Instead, mother appeared via telephone on August 22, 2022, and the social worker had been unable to provide mother with a copy of the petition or her referral for services. During the hearing, mother named an additional possible father for D.S. and an additional possible father for M.R. The section 300 petition was amended to include them. Mother was appointed counsel and the jurisdiction hearing was confirmed for September 2, 2022.

*Jurisdiction Report*

The report prepared in anticipation of the jurisdiction hearing reviewed the 10 prior child welfare referrals regarding mother and her children. The referrals included substantiated allegations for substance abuse because D.S. was born positive for methamphetamine in 2013, and a 2020 referral for general neglect when mother and R.R. were arrested after being found in a hotel room with the children and a large amount of marijuana. The report also relayed a 2021 referral for general neglect wherein mother's stepfather stated concern that R.R. had put his "private" in D.S.'s mouth, that R.R. had molested the girls, that mother was on drugs, that both mother and R.R.'s whereabouts were unknown, and that both mother and R.R. had outstanding warrants. And it was reported that D.H. had told a social worker that, in 2019, R.R. put his fingers inside her private parts and jumped in the shower when she was showering. In addition, R.H. reported that R.R. touched her private part when she was in the bath and put his hand inside her pants when she was clothed. R.H. reported that mother knew about the shower incident but not the other incidents. These 2019 allegations were found to be inconclusive.

It was reported that mother was convicted of child cruelty with possible injury or death in January 2021 and sentenced to probation and jail time. She also had an arrest for driving under the influence.

Notes from the Oklahoma referral, interviews and investigation were attached to the report.

8.

Mother appeared by telephone for the September 2, 2022, jurisdiction hearing. R.R. appeared in person. The juvenile court agreed to continue the matter for a combined jurisdiction and disposition hearing for September 22, 2022, as mother had tested positive for COVID-19.

*Disposition Report*

The disposition report by the agency recommended mother be offered services and R.R. be denied services pursuant to section 361.5, subdivision (b)(6). It also recommended that services be denied to the remaining three alleged absent fathers pursuant to section 361.5, subdivision (a).

The report stated there had been a restraining order issued in November 2020, which was to be in effect for three years, preventing contact between R.R. and the boys. However, R.R. reported that, despite the order, he had been granted full custody of M.R. in October 2021.

The report stated that, while R.R. was being investigated in Oklahoma for a sexual misconduct violation involving the girls, no charges had yet been filed. When R.R. fled to Oklahoma in January 2022, there was a bench warrant out for violation of probation.

In the report, the social worker stated mother failed to protect her children "ignoring the red flags of abuse," as there had been previous reports of inappropriate behavior on the part of R.R. The report noted the alleged molestation of D.S. in August 2021, as well as the fact that R.R. had been previously arrested for a lewd act with his daughter, G.R., in 2013. G.R. had reported going to bed and waking up with R.R. in the bed masturbating and he had her put her hand on his penis. G.R. later told a detective it was a " 'misunderstanding,' " and the charges were dropped.

The report noted that mother had not had any in-person communication with the social worker as mother chose only to communicate via email. The social worker requested that mother complete the social history and parent questionnaire on September 13, 2022, was reminded of it two days later, but at the time the report was

9.

written she had not yet responded. Mother had not had any visits with the children and only called mid-September to attempt to schedule visits.

The report also noted that, despite the active restraining order keeping R.R. from the boys, which was in effect until November 2023, mother filed paperwork in October 2021 to give R.R. custody of M.R. She also prepared a witnessed document giving permission to R.R. to care for D.M. until she got out of jail.

According to mother, she was forced to leave California by R.R. and she was scared of him. However, when contacted in Oklahoma, she had said she did not believe he was abusing her children and she denied any domestic violence. Mother reported to the California social worker that R.R. abused her and she was scared for her and her children's lives.

Mother's county probation officer confirmed that mother had an active warrant for failing to surrender and the probation department had no contact with her for a year as a result of being out of state and not providing information on her whereabouts.

As of a September 19, 2022, email from mother, mother had still not met the social worker in person or provided a valid residence address. In the email, mother asked for a referral to "[R]edwoods," as she missed and wanted her "baby's back already." The social worker replied that mother would need to complete a substance use disorder assessment and the clinician would then make recommendations. Mother was reminded that a referral had been faxed on August 31, 2022, and that the coordinator had likely called her, but mother's number had changed. The social worker advised mother to call the clinician with the telephone number provided.

*Jurisdiction/Disposition Hearing*

Mother did not appear either in person or via telephone at the September 22, 2022, scheduled jurisdiction and disposition hearing; R.R. did not appear either. Mother later told the social worker she did not appear in court because she had a warrant out for her

10.

arrest and was told by her attorney to " 'lay low.' "  She also claimed she tried to participate in the hearing via video, but was not able to connect.

The matter was continued to October 25, 2022, in order to ensure proper Indian Child Welfare Act notice, with a pretrial hearing scheduled for October 20, 2022.  The first amended petition (which added the names of the additional alleged fathers) had been inadvertently attached to the jurisdiction report and was ordered to be filed immediately.

An addendum report was filed, which continued to recommend that reunification services be granted to mother and denied to all fathers.  The report noted that mother had made little progress in the reunification process and communication was an issue.  Mother had completed a substance use assessment on October 12, 2022, was referred to a residential treatment program and was scheduled to enter on October 19, 2022.  Mother had still not applied for services at Sierra Vista despite multiple reminders and she had missed a parenting appointment.  She first visited the boys on October 11, 2022.

Mother did not appear in person or by telephone at the pretrial conference on October 20, 2022.  Nor was she present at the October 25, 2022, hearing, but one of the attorneys was out ill, requiring the matter to be rescheduled for November 3, 2022.

An addendum report filed for the November 3, 2022, hearing now recommended that mother be denied services pursuant to section 361.5, subdivision (e)(1) (parent incarcerated).  According to the report, mother, who had been in residential treatment for one week, was arrested on October 26, 2022, on her outstanding warrant, and she had been sentenced to state prison for two years on the previous charges.  The report noted that provision of services to mother would be detrimental to the boys as the length of incarceration would exceed the reunification period.  The report also reiterated that the boys or siblings of the boys had been sexually abused or were at risk of being sexually abused by a person known to mother, and there were no reasonable means to protect the boys without removing them from mother.

Neither mother nor R.R. were present at the November 3, 2022, hearing, which was continued to November 7, 2022, to allow mother to be transported to court and to allow the attorneys to speak to both parents about the changes in recommendations.

At the November 7, 2022, hearing, the juvenile court found proper notice had been given. Mother was present and the matter set for contested hearing on December 15, 2022, in order to allow sufficient time to arrange for mother to be transported to court. When mother was not transported for the December 15, 2022, hearing, the hearing was continued to January 31, 2023, to allow for mother's presence.

Prior to the January 31, 2023, hearing, an additional addendum report was filed, indicating that mother had sent certificates of completion to the social worker for courses in parenting and anger management skills in November 2022.

Because the request for prison transport was inadvertently not filed, mother appeared via video from prison at the January 31, 2023, hearing. Mother's counsel objected to the hearing proceeding because mother had not been served with forms JV-450 or JV-451 (both involving appearance at a hearing of an incarcerated parent) 15 days prior to the hearing, although mother was aware of the court date. The juvenile court found the notice mandatory and continued the matter to March 6, 2023, and directed that a new order for transport be prepared.

Updated log notes submitted to the juvenile court indicated that, on January 31, 2023, a services coordinator at the facility where mother was housed reported the facility had limited or no classes and that the inmates could enroll in correspondence courses, one class at a time.

A case note from February 23, 2023, indicated mother had been transferred to another facility and needed to wait 30 days before starting services. Mother had signed up for drug treatment services and was on the waiting list.

By this time, M.R. was having behavioral issues in preschool, and was "very detailed about the abuse he witnessed" while with mother. It was recommended he obtain counseling.

On February 27, 2023, the social worker received a phone call from mother stating she wanted to appear at the March 6, 2023, jurisdiction/disposition hearing via video, not in person, as she was now confined eight hours away.

At the March 6, 2023, contested jurisdiction/disposition hearing, mother appeared via video. The juvenile court first asked mother's counsel if she had gone over the first amended petition with mother. Since counsel had not had a chance due to "all the continuances," the juvenile court took a break to allow counsel to do so. When the hearing resumed, mother stated she understood the claims made in the first amended petition.

The agency and the boys' counsel submitted on the reports.

Mother testified on her own behalf that she was in a residential drug treatment program when "probation came and got me" due to an old warrant. While in custody, mother had completed a parenting course and an anger management course. She also testified that she completed a substance abuse program but was not there long enough to get her certificate. Mother claimed she would be out of custody "anywhere from April to June" 2023, and she would know for sure in a week.

On cross-examination, when asked what parenting course she had taken, mother replied that she had already sent "you guys the certificates." The juvenile court asked mother to briefly describe her parenting course, and mother said they sent her a packet of "all kinds of information" she had to read, and it took her "like a week maybe" to do so. She had to then answer a questionnaire, send the material back, and they sent her a certificate. When asked if she remembered any of the skills or strategies she had learned, mother replied, "No, but I have all the information still here in my stuff." In response to another question, mother stated that she could "[n]ot really at this moment" remember

13.

specifics, but it involved "stuff, like how to take care of your kids." When asked by the court what she remembered, mother stated, "How to take care of my kids, what's right and what is wrong, just common sense stuff."

Counsel for the agency then questioned mother about what she remembered learning from her anger management course. Mother replied, "I learned I did have a little bit of anger inside me that I didn't know I had," and "that's about it."

As for the substance abuse packet she received, mother said that also took her "around a week maybe" to get through and she learned her own substance abuse issues started with her parents' substance abuse. She thought she was now "doing fine," although, once she was no longer incarcerated, she "wouldn't mind taking any AA classes, parenting classes, anything I had to [do] to have my kids back in my life." When counsel for the agency asked, "But at this time, do you feel like if you weren't incarcerated, your children should be home with you?" mother replied, "Yeah, I feel like they should be home with me."

When asked, "So you would do any services just to show us that you're doing whatever is being asked of you?" mother replied, "[a]ny, any, just as long as I have my babies back." Mother then testified that she had had a "wake-up call" and "God sat me down for a minute" and "I do believe that I am good now. I do believe. I am done with drugs." The juvenile court asked mother about her drug history. She replied that her drug of choice was methamphetamine and she began using at age 14 but no longer had "any triggers."

When asked by the boys' counsel, mother stated she had done one parenting class two years earlier when she was arrested and another in November 2022. When asked to give an example of what she had learned, mother replied, "[j]ust how to answer to my kids, how to answer them back, like how to take care of them more. It's just—I don't know."

14.

On redirect, mother's counsel asked about mother's understanding of her drug use and whether she needed support to stay sober. Mother replied, "I honestly don't feel that I need support right now to stay sober. I don't feel that I have any triggers."

In closing, mother's counsel argued the agency had a duty to assess mother based on her new release date.

Counsel for the agency noted that, while the agency changed its recommendation to bypass mother once she was sentenced, there was also concern that mother was not making any real progress in addressing the issues that led to removal of the children. Counsel noted that mother was not able to discuss or articulate what she had learned and believed she was doing fine, although she came into the system with some very serious failure to protect issues, as well as domestic violence in the presence of the children and absconding with the children from one state to another in the middle of a pending investigation. Counsel recommended services be bypassed and, if circumstances changed for mother, she could utilize the section 388 process to request services. The information the agency had was that mother was not supposed to be released until September 2023. Based on all the evidence before the juvenile court, counsel argued that services for mother would not be in the boys' best interests and would be detrimental to them.

*Juvenile Court's Findings*

As for jurisdiction, the juvenile court, in its ruling, found by a preponderance of the evidence that the allegations in the first amended petition were true. The court noted, as to the section 300, subdivision (d) allegations, that D.S. had said R.R. was mean and hit him; that his sisters were not safe in the home because R.R. did "nasty things" to them, including oral sex, and that mother knew of R.R.'s inappropriate sexual activities when it was reported in 2019. The court further noted "[o]ne of the girls" reported in 2019 that R.R. took a shower with her and digitally penetrated her. The girl had said her mother knew about it, but still allowed R.R. to have access to the girls.

15.

As for the section 300, subdivision (b) allegations, the juvenile court noted that mother failed to adequately protect the children from inappropriate sexual touching by R.R., finding the children were "more reliable reporters" than mother, and it was concerning that mother did not believe them or protect them. The court also noted mother's significant substance abuse history and that she had been convicted of felony child cruelty in January 2021. There were also reports of domestic violence between mother and R.R. and one of the girls did not feel safe in the home. Finally, the court noted that R.R. himself stated that he had mental health issues that were not being properly addressed.

The juvenile court declared the children to be dependents and found clear and convincing evidence to remove them from parental custody. It found mother's progress to be very limited, although it acknowledged barriers for a parent when incarcerated. It found the progress of R.R. and the three alleged fathers to be none.

The juvenile court denied reunification services to R.R. pursuant to section 361.5, subdivision (b)(6) "given the fact that [he] has sexually molested—or the Court believes that there is clear and convincing evidence that he has sexually molested both of these boys, as well as potentially other children who were in the home …." Services were further denied to the three alleged fathers pursuant to section 361.5, subdivision (a).

As for mother, the juvenile court noted the timing difficulty of the situation because her release date was not known and, if it was in September 2023, it would be past or very close to the end of the time allowed for reunification services. However, the court stated it would not deny services pursuant to section 361.5, subdivision (e)(1), but denied them instead pursuant to section 361.5, subdivision (b)(6). In doing so, it explained that it had real concerns about whether reunification services would be in the boys' best interests or welfare because there had been, "in this Court's mind, severe sexual abuse of these children, and it is very concerning that the mother was aware of the sexual abuse and did not take any actions to protect these children." It stated further,

16.

"[t]here was a restraining order, and mother still allowed [R.R.] access to the children. And it appears that the sexual inappropriateness by [R.R.] was occurring for a period of close to two years, if not even longer than that, and that is extremely concerning to this Court. And the Court does find that the mother was aware of the sexual abuse and took no action to prevent that." Finally, the court stated that it was also very concerned about mother's testimony regarding her substance abuse because she had been abusing substances for a significant period of time, yet claimed she needed no support and had no triggers on that issue.

A section 366.26 hearing was scheduled for July 6, 2023.

## DISCUSSION

"Generally, the juvenile court is required to provide reunification services to a child and the child's parents when a child is removed from parental custody under the dependency laws. (§ 361.5, subd. (a).)" (*In re I.A.* (2019) 40 Cal.App.5th 19, 23.) Nonetheless, the statutory scheme sets forth certain situations where reunification services may be "bypassed" because "the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation." (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1120.)

The bypass provision at issue here—section 361.5, subdivision (b)(6)—applies when a "child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse … to the child, a sibling, or a half sibling by a parent or guardian …, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (§ 361.5, subd. (b)(6)(A).)

> "A finding of severe sexual abuse, for the purposes of this subdivision, may be based on, but is not limited to, sexual intercourse, or stimulation involving genital-genital, oral-genital, anal-genital, or oral-anal contact, whether between the parent or guardian and the child or a sibling or

17.

half sibling of the child, or between the child or a sibling or half sibling of the child and another person or animal with the actual or implied consent of the parent or guardian; or the penetration or manipulation of the child's, sibling's, or half sibling's genital organs or rectum by any animate or inanimate object for the sexual gratification of the parent or guardian, or for the sexual gratification of another person with the actual or implied consent of the parent or guardian." (§ 361.5, subd. (b)(6)(B).)

The agency has the burden to prove the threshold issue of whether section 361.5, subdivision (b) applies. (*In re T.R.* (2023) 87 Cal.App.5th 1140, 1148.) Once it does so, " ' " 'the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]' " [Citation.]' [Citations.] Thus, if the juvenile court finds a provision of section 361.5, subdivision (b), applies, the court 'shall not order reunification for [the] parent … unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child.' (§ 361.5, subd. (c)(2).) 'The burden is on the parent to … show that reunification would serve the best interests of the child.' " (*In re I.A.*, *supra*, 40 Cal.App.5th at p. 24.)

We review a juvenile court's factual findings under section 361.5 for substantial evidence. (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1164.) In doing so, we consider the evidence in the light most favorable to the trial court's findings. (*In re T.G.* (2015) 242 Cal.App.4th 976, 987.)

*Due Process*

Mother argues first that the juvenile court deprived her of due process in bypassing reunification services pursuant to section 361.5, subdivision (b)(6) when mother was not on notice that services might be bypassed under that provision. Mother, however, did not raise this argument before the juvenile court. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected.

18.

[Citation.]  [¶]  Dependency matters are not exempt from this rule." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.)

"A defect in notice … is a most serious issue, potentially jeopardizing the integrity of the entire judicial process.  However, when a parent had the opportunity to present that issue to the juvenile court and failed to do so, appellate courts routinely refuse to exercise their limited discretion to consider the matter on appeal.  This is precisely because defective notice and the consequences flowing from it may easily be corrected if promptly raised in the juvenile court." (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 754; see also *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1152 [finding father waived issue of improper notice of section 366.26 hearing by failing to raise it below].)

Here, in an addendum report filed for the scheduled November 3, 2022, disposition hearing, the agency changed its recommendation granting mother reunification services to denying them pursuant to section 361.5, subdivision (e)(1), which provides that reasonable services be provided to a parent who is incarcerated unless the court finds those services would be detrimental to the child due, inter alia, to the length of time a parent is incarcerated.

At the contested disposition hearing, held on March 6, 2023, mother and her counsel were both present.  Through counsel, mother argued that it was a "mistaken assumption" she would be incarcerated past the reunification period and asked that she receive reunification services.

Because mother's release date was in question, the juvenile court rejected the agency's recommendation to deny services pursuant to section 361.5, subdivision (e)(1), and instead said it would deny services pursuant to section 361.5, subdivision (b)(6).  At no point did mother argue she did not have notice that reunification services might be bypassed or that her due process rights were being violated, nor did she request a continuance to address the issue.  Accordingly, she has forfeited her argument on review.

*Substantial Evidence*

Even if the juvenile court's order did not violate her due process rights, mother argues, the bypass order should still be reversed because it was not supported by substantial evidence. We disagree.

As noted above, section 361.5, subdivision (b)(6)(A) requires the juvenile court to make "a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian" before that parent or guardian can be bypassed pursuant to that specific statutory provision. Independently, section 361.5, subdivision (c)(2) requires that if the juvenile court determines section 361.5, subdivision (b)(6) applies at disposition, the juvenile court "shall not" order reunification services unless it "finds, by clear and convincing evidence, that reunification is in the best interest of the child."

While the concept of what is in a child's best interest is an " ' "elusive guideline" ' " not subject to rigid definition (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227), courts have considered "the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity." (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1116.) In particular, to determine whether "reunification services will benefit the child" pursuant to section 361.5, subdivision (b)(6), section 361.5, subdivision (i) directs the court to consider "any information it deems relevant," including: "(1) The specific act or omission comprising the severe sexual abuse … inflicted on the child or the child's sibling or half sibling. [¶] (2) The circumstances under which the abuse or harm was inflicted .… [¶] (3) The severity of the emotional trauma suffered by the child or the child's sibling or half sibling. [¶] (4) Any history of abuse of other children by the offending parent or guardian. [¶] (5) The likelihood that the child may be safely returned to the care of the offending parent or

guardian within 12 months with no continuing supervision. [¶] (6) Whether or not the child desires to be reunified with the offending parent or guardian."

Here, the juvenile court expressly considered the sexual abuse inflicted by R.R., the circumstances under which he inflicted that abuse, his past history of abuse, and the likelihood the boys could be safely returned to mother's custody within 12 months. These are all appropriate considerations, and the evidence supports the court's conclusion regarding the boys' best interests.

As we have described, the evidence submitted to the juvenile court established that R.R. repeatedly sexually abused the girls, that there were instances when he abused the boys, and that the abuse had gone on for years, as evidenced by earlier substantiated instances of abuse against mother's older daughter, B.S., and R.R.'s older daughter, G.R. The evidence also established that the ongoing abusive behavior created significant emotional trauma to the children, in that D.S. expressed that he did not feel safe with R.R., M.R. was exhibiting inappropriate behavior at preschool, and one of the girls, R.H., was described as withdrawn, frightened and sad when interviewed.

Before we address the issue of sufficiency of the evidence, we reject mother's contention that, because she was never alleged in the petition to be the perpetrator of sexual abuse, section 361.5, subdivision (b)(6) did not apply to her. However, by its express terms, section 361.5, subdivision (b)(6) applies to a parent who gave actual or implied consent to the sexual abuse of the child by another person. (§ 361.5, subd. (b)(6)(B).) Here, there is sufficient evidence to find that R.R.'s abuse of the children was with mother's "implied consent," and therefore, she was an offending parent within the meaning of section 361.5, subdivision (b)(6). (§ 361.5, subd. (b)(6)(B); see *Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, 561.)

In denying reunification services to mother for the boys, the juvenile court specifically found reunification would not be in the best interests of the boys because there had been "severe sexual abuse of these children" and "mother was aware of the

21.

sexual abuse and did not take any actions to protect these children." This included sexual abuse perpetrated on the girls, including oral sex, when it was reported back in 2019.

The juvenile court noted there had been a restraining order against R.R. and mother still allowed him access to the children, even though there had been "sexual inappropriateness" by R.R. "occurring for a period of close to two years, if not even longer than that." And, despite the restraining order against R.R., mother actively placed the boys in R.R.'s custody and signed a consent in October 2021 to that extent. This action was taken by mother just two months after D.S. reported to his grandfather that R.R. had sexually abused him, which was reported to both the police and social services, resulting in R.R. being arrested in front of mother for violating the restraining order. Mother gave further implied consent to the sexual abuse when she took the girls, siblings to the boys at issue here, from their father's care in January 2022 without his consent and took them to Oklahoma with R.R.

Nothing in the evidence before the juvenile court suggested the likelihood that the boys would be safely returned to mother within 12 months with no continuing supervision. Mother's testimony at the disposition hearing showed that she took no responsibility for contributing to the children's abuse and she had no insight into her lack of parenting skills or severe substance abuse problem. Mother could not remember anything she had been taught by the correspondence parenting class and insisted that her long-term substance abuse issue needed no further treatment. The court also noted mother's testimony regarding her significant substance abuse history and found suspect her statements that she did not need support to stay sober and had no triggers.

From the beginning of the case, mother demonstrated that she was far more concerned with her own interests in evading arrest on her outstanding warrant, which stemmed from her previous child cruelty conviction, than she was about addressing the issues in the present case or even visiting the boys. She spent the first two and one-half months of the case avoiding any in-person contact with the juvenile court or

22.

agency and not giving a valid residence or mailing address. This resulted in her not having any visits with the boys until the middle of October 2022. Shortly thereafter, she was arrested and sent to prison, where she was unable to visit the boys. As a result, in the seven months between detention and disposition, mother visited the boys only once.

If reunification is unlikely to be successful, then the child's interest in stability and continuity is best served by proceeding to permanency planning rather than engaging in protracted and ultimately fruitless reunification efforts. (See *In re William B.*, *supra*, 163 Cal.App.4th at p. 1229 ["The best interests of the child are not served by merely postponing his chance for stability and continuity and subjecting him to another failed placement with the parent."].)

For this court to overturn the juvenile court's denial of services order, mother would have to show that substantial evidence does not support application of section 361.5, subdivision (b)(6), as she bears the burden on appeal. Mother has failed to carry her burden. Consequently, we must deny her writ petition.

## DISPOSITION

The petition for extraordinary writ is denied.

23.